## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TONY JACKSON,                         :
                                      :
      Plaintiff,                     :        Case No. 2:08-cv-05144-SD
                                      :
    v.                             :        Judge Stewart Dalzell
                                      :
PLANCO Financial Services, L.L.C.,    :
                                      :
      Defendant.                     :
                                      :

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION .................................................................................................1

II.   THE UNDISPUTED FACTS REQUIRE GRANTING SUMMARY
      JUDGMENT IN PLANCO'S FAVOR ..............................................................2

      A.    Background, including Mr. Jackson's First Leave of Absence ................2

      B.    PLANCO Hires New Management to "Raise the Bar" .............................3

      C.    Mr. Jackson's Second Leave of Absence ..................................................4

      D.    Mr. Jackson's Performance Fails to Meet Expectations...........................4

      E.    PLANCO Investigates Mr. Jackson's Report to Human Resources .........6

      F.    Mr. Jackson Visits Gun Websites Knowing The Hartford's Internet
            Filter Is Down ...........................................................................................8

III.  ARGUMENT.......................................................................................................12

      A.    Mr. Jackson's Claims Are Factually and Legally Deficient....................12

      B.    Mr. Jackson Cannot Meet His Burden of Proving That His
            Employment Was Terminated Because of His Real or Perceived
            Disability ..................................................................................................14

      C.    Mr. Jackson Cannot Meet His Burden of Proving That His Real or
            Perceived Disability Motivated His Performance Management .............18

      D.    Mr. Jackson Did Not Work in a Hostile Work Environment. ..................20

            1.    Mr. Jackson cannot establish disability-based harassment...........20

            2.    Any alleged harassment was not severe or pervasive..................21

      E.    PLANCO Did Not Retaliate Against Mr. Jackson ..................................21

      F.    Mr. Jackson Can Point to No Evidence of FMLA Retaliation................24

IV.   CONCLUSION ...................................................................................................25

## TABLE OF AUTHORITIES

CASES

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199 (3d Cir. 2009) ................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).......................................................13

*Bailey v. Commerce Nat. Ins. Services Inc.*, 474 F. Supp. 2d 577 (D. Del. 2007)............24

*Barclay v. Amtrak*, 435 F. Supp. 2d 438 (E.D. Pa. 2006)..............................................20, 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................12

*Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194 (3d Cir. 1994),
    *cert. denied*, 513 U.S. 1022 (1994).........................................................................13

*Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135 (3d Cir. 2004) ...............................14

*Elston v. UPMC-Presbyterian Shadyside*, No. 2:06-cv-329, 2007 WL 3120291
    (W.D. Pa. Oct. 23, 2007) ...........................................................................................17

*Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) ...............................................22

*Evans v. Maax-KSD Corp.*, No. 08-1627, 2009 WL 282023,
    (3d Cir. Feb. 6, 2009) .................................................................................................14

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)...........................................................14, 15

*Goins v. Echostar Commc'ns, Corp.*, 148 Fed. Appx. 96
    (3rd Cir. Aug. 21, 2005) .............................................................................................17

*Griffin v. De Lage Landen Fin. Servs., Inc.*, 219 Fed. Appx. 245
    (3d Cir. 2007) .............................................................................................................21

*Hunter v. Rowan Univ.*, 299 Fed. Appx. 190 (3d Cir. 2008).............................................19

*Clayton v. Pa. Dept. of Public Welfare*, No. 05-0768, 2007 WL 575677
    (M.D. Pa. Feb. 20, 2007) ...........................................................................................21

*Johnson v. Fulton Concrete Co.*, 330 F. Supp. 2d 1330 (N.D. Ga. 2004)........................16

*Jones v. Johnson & Johnson, McNeil – PPC, Inc.*, No. 94-7473,
    1997 WL 549995 (E.D. Pa. Aug. 22, 1997) ..............................................................16

*Kauffman v. GMAC Mortgage*, 229 Fed. Appx. 164 (3d Cir. 2007).................................22

*Kautz v. Met-Pro Corp.*, 412 F.3d 463 (3d Cir. 2005) .......................................................15

*Lackman v. Recovery Servs. of N.J., Inc.*, No. 06-2016, 2008 WL 583660
    (D.N.J. Feb. 13, 2008) ...........................................................................24

*Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61 (3d Cir. 1996) ............................12

*Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318 (3d Cir. 2005).....................................13

*Marion v. City of Phila.*, No. 00-3553, 2002 WL 31761426 (E.D. Pa. Dec. 9, 2002)......13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................13

*Maurizio v. Fox Chapel Foods, Inc.*, No. 04-1168, 2006 WL 2571397
    (W.D. Pa. Sept. 5, 2006) .......................................................................25

*Nelson v. DeVry, Inc.*, No. 07-4436, 2009 WL 1213640 (E.D. Pa. Apr. 23, 2009) ..........19

*Peter v. Lincoln Technical Inst.*, 255 F. Supp. 2d 417 (E.D. Pa. 2002) ............................24

*Pritchett v. Imperial Metal & Chem. Co.*, No. 96-0342, 1997 WL 570929
    (E.D. Pa. Sept. 8, 1997) ........................................................................22

*Reap v. Cont'l Cas. Co.*, No. 99-1239, 2002 WL 1498679 (D.N.J. June 28, 2002) .........23

*Ruiz v. Morris County Sheriff's Dept.*, No. 05-1825, 2008 WL 2229851
    (D.N.J. May 28, 2008) ...........................................................................24

*Schofield v. Metro. Life Ins. Co.*, No. 03-0357, 2006 WL 2660704
    (M.D. Pa. Sept. 15, 2006) ......................................................................24

*Simpson v. Kay Jewelers*, 142 F.3d 639 (3d Cir. 1998) ....................................................17

*Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir. 2001) ......................................14

*Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000).................................................16

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008) ....................13

*Stouch v. Twp. of Irvington*, No. 03-6048, 2008 WL 2783338
    (D.N.J. Jul. 16, 2008)............................................................................22

*Van Haste v. Coram Healthcare Corp.*, No. 06-4637, 2008 WL 4513864
    (D.N.J. Oct. 1, 2008) .............................................................................17

*Walton v. Mental Health Ass'n of SE Pa.*, 168 F.3d 661 (3d Cir. 1998)..........................20

*Wilkes v. McBee Sys., Inc.*, 181 F.3d 106, 1999 WL 357748 (6th Cir. 1999) ................... 16

*Williams v. Phila. Housing Auth. Police Dept.*, 380 F.3d 751 (3d Cir. 2004) ............ 22, 23

*Zappan v. Pa. Bd. of Probation & Parole*, No. 00-1409, 2002 WL 32174230
    (E.D. Pa. Nov. 25, 2002) ...................................................................................... 22

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................... 13

## I.    INTRODUCTION

On May 8, 2007, mere weeks after the shooting tragedy at Virginia Tech,

PLANCO Financial Services, L.L.C. ("PLANCO") terminated Plaintiff Tony Jackson's

("Mr. Jackson") at will employment due to safety concerns associated with his viewing

gun-related websites in violation of Company policy.   PLANCO made this decision

against a backdrop highly suggestive of legitimate concerns about employee safety.  In

the weeks leading up to his employment termination, Mr. Jackson, an admitted gun

enthusiast who owns a sizable gun collection, including an Uzi, was increasingly

frustrated with his manager's criticism of his job performance; he did not think it fair and

had complained as such.  The day after PLANCO told him that it had found no evidence

to support his allegations that his performance reviews were the product of any

discrimination, harassment or leaves of absence he had taken, Mr. Jackson intentionally

accessed gun websites despite knowing that PLANCO's internet filter ordinarily blocked

access to those sites.   When his supervisor saw him surfing a gun website, she reported it

to Human Resources, saying she was afraid of what Mr. Jackson might do under the

circumstances.  The Human Resources manager, believing Mr. Jackson's supervisor to be

legitimately scared, reported the situation to PLANCO's Senior Vice President who, after

a Company investigation, decided to terminate Mr. Jackson's employment rather than

risk the potential safety of other PLANCO employees.

Now, Mr. Jackson challenges this decision (and a host of other ones), claiming it

was retaliatory and really because he has an alleged disability.  Despite extensive

discovery, however, Mr. Jackson has not adduced any evidence, concrete or otherwise,

from which a reasonable juror could find in his favor.  He has no evidence that

PLANCO's Senior Vice President based his decision to terminate Mr. Jackson's

employment on anything other than his conclusion that two weeks after the Virginia Tech

massacre, a frustrated employee with an apparent fascination with guns, who was on the

verge of termination for poor performance and who was told the day before that an

internal investigation found no evidence to support his claims of discrimination and

harassment, was seen surfing gun websites that PLANCO's internet filter typically

blocks.  The best that Mr. Jackson can offer is his own belief that, deep down, his

colleagues did not truly believe him to present a "real" threat.  He is simply wrong.

Regardless, as a matter of law, Mr. Jackson's speculation, conjecture and own beliefs are

legally insufficient to defeat PLANCO's Motion.  Accordingly, this Court should enter

summary judgment in PLANCO's favor on each and every claim.

## II.    THE UNDISPUTED FACTS REQUIRE GRANTING SUMMARY JUDGMENT IN PLANCO'S FAVOR.

### A.    Background, including Mr. Jackson's First Leave of Absence

PLANCO markets and promotes The Hartford family of financial products,

including annuities and mutual funds, to brokers and brokerage firms.  (Mary Creedon

Declaration ("Creedon Decl."), attached hereto as Exhibit A, ¶ 2).  In September 2004,

Mr. Jackson began working at PLANCO, on a temporary basis, as a Lotus Notes

Administrator.  (Tony Jackson Deposition ("Jackson Dep."), attached hereto as Exhibit

B, at 35:12-36:5).  In December 2004, PLANCO hired Mr. Jackson as an at will

employee in the same role.  (*Id.* at 36:6-12).[1]

When Mr. Jackson first began working at PLANCO, his manager was Eric

---

[1] In this role, Mr. Jackson was responsible for the Lotus/Notes Domino system, which encompasses several software programs, including the Lotus Notes e-mail program that interfaces with portable machines, such as Blackberrys, and software that creates databases and stores information. (Jackson Dep., Ex. B, 36:13-37:16).

2

Paladino and his team lead/supervisor was Jay Karabin. (*Id.* at 85:8-22). In July 2005, Christie Vazquez replaced Jay Karabin as team lead. (*Id.* at 88:13-24). By the end of 2005, Ms. Vazquez began to have concerns with Mr. Jackson's job performance. (Christie Vazquez Deposition ("Vazquez Dep."), Ex. C, 37:14-38:3). Then, in January 2006, Mr. Jackson experienced serious medical issues. He had two strokes and a heart attack. These events caused Mr. Jackson to take a medical leave from work from January through April 2006. (Jackson Dep., Ex. B, 104:23-105:12). At the end of April 2006, Mr. Jackson's neurologist released him to return to work 20 hours per week from home, which PLANCO permitted.[2] (*Id.* at 105:13-24). Soon thereafter, Mr. Jackson was released to return to work full time without restrictions.[3]

### B.    PLANCO Hires New Management to "Raise the Bar"

In July 2006, PLANCO hired Steve Olshevski to replace Mr. Paladino as Assistant Director of the Technical Operations Department (the "Department"). (Steve Olshevski Deposition ("Olshevski Dep."), attached hereto as Exhibit D, 8:24-9:1, 10:2-4). The perception was that the Department was not performing well and PLANCO management specifically charged Mr. Olshevski with improving the Department's level of "customer service." (*Id.* at 13:6-21). In support of this goal, Mr. Olshevski "empowered [the team leads] to be more involved in how is this person performing, are they getting their tasks done, those types of things." (Vazquez Dep., Ex. C, 11:2-10; *see also* Olshevski Dep., Ex. D, 26:3-27:4). As a result, in early August 2006, Ms. Vazquez met with Mr. Olshevski and expressed her long-standing dissatisfaction with Mr.

---

[2] Mr. Jackson was satisfied with the way that PLANCO handled him taking leave. (Jackson Dep., Ex. B, 107:2-4).
[3] There is no evidence in the record that Mr. Jackson's return to work was not at a full-time schedule.

Jackson's performance. (Vazquez Dep., Ex. C, 36:21-38:21; Olshevski Dep., Ex. D, 28:16-29:8). She told Mr. Olshevski that she had little confidence that Mr. Jackson could properly complete tasks. (Vazquez Dep., Ex. C, 36:21-37:10; Olshevski Dep., Ex. D, 28:16-23). She expressly said that she believed the issues that PLANCO was experiencing with its Lotus Notes system at the time were largely due to Mr. Jackson. (Vazquez Dep., Ex. C, 37:5-10).

### C.    Mr. Jackson's Second Leave of Absence

In September 2006, Mr. Jackson had another, albeit brief, medical setback. This time it was gout, for which he took a one week leave from work (September 21-27, 2006).[4] (Jackson Dep., Ex. B, 54:20-55:5; Compl., ¶ 19). When Mr. Jackson returned to work the following week, he could walk short and long distances, although he needed the aid of a cane. (Jackson Dep., Ex. B, 62:21-63:3). After October 2006, Mr. Jackson no longer used a cane. (*Id.* at 335:2-4).[5]

### D.    Mr. Jackson's Performance Fails to Meet Expectations

On or about October 9, 2006, Mr. Jackson met with Mr. Olshevski and Ms. Vazquez to discuss his job performance. (Jackson Dep., Ex. B, 118:18-119:1; October 2006 Memorandum, attached hereto as Exhibit E). In this meeting, Mr. Olshevski and Ms. Vazquez presented Mr. Jackson with a memorandum that outlined several deficiencies and the Company's expectations for his addressing them on a go-forward basis. (Jackson Dep., Ex. B, 119:2-6; Christie Vazquez Declaration ("Vazquez Decl."),

---

[4] Mr. Jackson had no complaints about the way PLANCO managed this leave. (Jackson Dep., Ex. B, 107:12-21). In addition, conspicuously absent is any claim that Mr. Jackson ever asked for an accommodation for this or any condition.

[5] In addition to the conditions that led to his leaves of absence in January and September 2006 (see below), Mr. Jackson suffered from atrial fibrillation (an irregular heartbeat) and sleep apnea. (Jackson Dep., Ex. B, 53:6-11, 63:21-64:5).

attached hereto as Exhibit F, ¶ 2).

The following month, November 2006, Mr. Jackson received his annual performance review. He was again told he was not meeting expectations in the following areas: managing ACLS, User IDs, Groups, and other daily administration and security functions; remote user support and software installations, upgrades, and patches; system monitoring – performance and availability; and providing advanced server system administration. (*See* November 2006 Review, attached hereto as Exhibit G).

The review set out areas for development, including improving technical knowledge of Email Messaging Platforms; demonstrating improvements in system availability and performance; assuming ownership of deploying MS patches to the Lotus Domino servers; and improving the deficiencies within the Lotus Domino ACL and group aspect by developing a plan to remedy the current environment. (*Id.*). This review also set forth various tasks for Mr. Jackson to complete, including the submission of three plans within 30 to 60 days. (*Id.*).

Over the ensuing months, Ms. Vazquez continued to manage Mr. Jackson's job performance in an effort to help him improve and demonstrate his skill set. Accordingly, she did not issue any written reviews between November 2006 and January 2007 even though Mr. Jackson's performance problems continued. (Vazquez Decl., Ex. F, ¶ 3). When things did not improver, however, Ms. Vazquez gave Mr. Jackson a memo (dated January 19, 2007) entitled "Performance." This memo reviewed Mr. Jackson's progress against the expectations outlined in his November 2006 Performance Review. (*See* 1/19/07 Memorandum, attached hereto as Exhibit H). Ms. Vazquez noted that Mr. Jackson failed to deliver the three different plans assigned at his review. (*Id.*).

Approximately two weeks later, on January 30, 2007, Mr. Jackson received another memo from Ms. Vazquez. This one discussed the plans listed in the January 19, 2007 memo that were late. (*See* 1/30/07 Memorandum, attached hereto as Exhibit I). In addition, Ms. Vazquez asked Mr. Jackson to give a presentation on the Lotus Notes system. She wanted to give him an opportunity to demonstrate his knowledge. (Vazquez Decl., Ex. F, ¶ 4).

On February 24, 2007, shortly after Mr. Jackson gave his presentation, he received yet another performance-related memo. This memo, entitled "Performance Review Weekly Progress," discussed his Lotus Notes presentation, setting forth the deficiencies in it. (*See* 2/24/07 Memorandum, attached hereto as Exhibit J). Ms. Vazquez found that the "information and presentation was not what is expected of someone at his administration level." (*Id.*). She said she was "not confident that Tony [Jackson] can perform adequately as the Lotus Notes Administrator. His knowledge of the environment and of the Lotus Notes application is not at the level it should be for someone in this position." (*Id.*).

By this time, Mr. Jackson's frustration had become apparent. (*See* Vazquez Decl., Ex. F, ¶ 5). He clearly believed that PLANCO was asking him to do things that he should not have to do and that there was nothing wrong with his performance. In his opinion, every criticism of his performance was wrong. (Jackson Dep., Ex. B, 140:16-19, 157:2-6, 173:7-10, 191:16-193:4, 207:9-208:12, 209:12-17).

**E.     PLANCO Investigates Mr. Jackson's Report to Human Resources**

Although most of the criticism he was receiving regarding his job performance came from Ms. Vazquez, on March 22, 2007, Mr. Jackson complained to Mary Creedon, Assistant Vice President of Human Resources, that Mr. Olshevski was discriminating

against him.  (Jackson Dep., Ex. B, 222:15-24; Mary Creedon Deposition ("Creedon

Dep."), attached hereto as Exhibit K, 9:20-22, 10:23-11:1, 31:19-21).  Mr. Jackson

complained that Mr. Olshevski always found fault with his work, that he could not get

anything done properly for Mr. Olshevski, that he had received poor performance

reviews, and that Mr. Olshevski would assign him tasks just as he was leaving.  (Jackson

Dep., Ex. B, 222:17-223:22).  As was the typical practice with employee complaints, Ms.

Creedon called Gregg Goumas, Practice Leader of Employee Relations Investigations at

Hartford, to investigate these claims.[6]  (Jackson Dep., Ex. B, 234:19-24;  Creedon Dep.,

Ex. K, 33:3-7; Gregg Goumas Deposition ("Goumas Dep."), attached hereto as Exhibit L,

11:13-23, 27:20-28:4).

On April 3, 2007, Ms. Creedon and Mr. Goumas interviewed Mr. Jackson to

discuss his concerns.  (Creedon Dep., Ex. K, 33:13-22; Goumas Dep., Ex. L, 37:7-21).

Mr. Jackson said that ever since he was in the hospital in September 2006, his

relationship with Mr. Olshevski had deteriorated.  (Goumas Dep., Ex. L, 79:13-80:7).

Mr. Goumas then separately interviewed Mr. Olshevski, Mr. Paladino and Ms. Vazquez.

(Goumas Dep., Ex. L, 39:1-14; 51:16-17; 66:19-24).  Mr. Goumas also reviewed Mr.

Jackson's 2006 performance evaluation as well as other performance-related counseling

documents.  (*Id.* at 53:1-7).  After conducting the interviews, Mr. Goumas found two

consistent themes:  (1) Mr. Jackson was not properly performing his job (*Id.* at 85:4-23);

and (2) there was no evidence that anything other than Mr. Jackson's poor performance

motivated the performance reviews and performance management plan.  (*Id.* at 108:18-

109:4).

---

[6] As Practice Leader of Employee Relations Investigations, Mr. Goumas investigates claims of
discrimination internally at PLANCO and Hartford.  He also responds to administrative charges
of discrimination filed against both entities.  (Goumas Dep., Ex. L, 18:5-22).

On April 30, 2007, Ms. Creedon, Mr. Jackson, and Jamie Davis, Human

Resources Generalist, met so Mr. Goumas could present the findings of his investigation

via telephone.  (Jackson Dep., Ex. B, 236:20-24; Creedon Dep., Ex. K, 37:11-38:5; Jamie

Davis Deposition ("Davis Dep."), Ex. M, 6:24-7:7, 29:19-30:13).  Mr. Goumas explained

that he did not find evidence substantiating Mr. Jackson's disability discrimination claim.

Instead, he found the performance evaluations well supported.  (Creedon, Dep., Ex. K,

37:11-20; Goumas Dep., Ex. L, 108:15-109:2).  Ms. Creedon then told Mr. Jackson that

because there was no finding of discrimination, Mr. Olshevski and Ms. Vazquez would

continue to manage his performance to ensure he was meeting the expectations of his

job.[7]  (Creedon Dep., Ex. K, 37:21-38:5).  Alternatively, Ms. Creedon offered Mr.

Jackson a data management job.[8]  (Creedon Dep., Ex. K, 37:21-38:6; Goumas Dep., Ex.

L, 109:3-13; Creedon Decl., Ex. A, ¶¶ 10-11, 13).  Because the position had lesser

responsibilities, it had a lower salary.  (Id.).  Mr. Jackson angrily rejected this offer.

(Creedon Dep., Ex. K, 38:13-39:7).

### F.    Mr. Jackson Visits Gun Websites Knowing The Hartford's Internet Filter Is Down

The next day, May 1, 2007, while at work, Mr. Jackson went to playboy.com to

check if the Company's internet filter was working.  (Jackson Dep., Ex. B, 244:24-

245:6).  After he determined it was not working, over the course of May 1st and 2nd, he

proceeded to visit a series of websites ordinarily blocked by Hartford's internet filter that

---

[7] Per Ms. Creedon's instruction, Mr. Olshevski and Ms. Vazquez did not performance manage
Mr. Jackson, nor did they issue any discipline, during the investigation.  (Creedon Decl., Ex. A, ¶
6).
[8] The data management department is a small department within Technical Operations, which
tracks and logs sales information into the PLANCO computer systems to ensure proper
compensation of PLANCO salespeople.  (Creedon Dep., Ex. K, 38:6-15).

sold firearms.[9]  (Jackson Dep., Ex. B, 245:14-18, 250:8-254:21, 292:7-11; *see also*

Listing of Gun Websites, attached hereto as Exhibit N).

On May 2, 2007, Ms. Vazquez saw Mr. Jackson accessing a gun website.

(Vazquez Dep., Ex. C, 24:21-25:12).  She immediately became scared.  (Vazquez Dep.,

Ex. C, 31:9-10; Davis Dep., Ex. M, 45:19-46:8; *see also* Alan Hoyt Deposition ("Hoyt

Dep."), attached hereto as Exhibit O, 34:1-35:6).  It was just two weeks after the Virginia

Tech shooting, and Ms. Vazquez knew that Mr. Jackson had a fascination with guns and

a sizable gun collection.  (Vazquez Decl., Ex. F, ¶ 6; Vazquez Dep., Ex. C, 17:22-18:5).

She also knew that Mr. Jackson was upset about being performance managed.  (Vazquez

Decl., Ex. F, ¶ 5).  She was about to resume Mr. Jackson's performance management by

giving him several more negative performance "write-ups," and she was afraid of what

Mr. Jackson might do if she did so.  (Vazquez Dep., Ex. C, 25:3-12).  She promptly went

to Jamie Davis in Human Resources and reported what she had seen.  (Vazquez Dep., Ex.

C, 30:20-31:10; Davis Dep., Ex. M, 45:11-18).

Ms. Davis immediately contacted Matt Szoke, Security Team Lead at the time,

and asked him to run a print-out of Mr. Jackson's internet activity for that day.  (Davis

Dep., Ex. M, 47:5-13; Matt Szoke Deposition ("Szoke Dep."), attached hereto as Exhibit

P, 15:9-18, 57:11-58:15).  Within an hour, Ms. Davis received and reviewed the report.

There were "a lot of pictures of guns."  (Davis Dep., Ex. M, 47:20-22; 50:17-51:4; *see*

*also* Listing of gun websites, Ex. N).

After seeing this, Ms. Davis went to Kevin Connor, then Vice President of

---

[9] PLANCO's computer system has a filter that prevents access to identified websites.  On this day, Mr. Jackson knew the filter was down because Matt Szoke, Security Team Lead at the time, who controlled the filter announced that it was down and that he was working to correct it. (Jackson Dep., Ex. B, 246:13-17).

PLANCO. (Kevin Connor Deposition ("Connor Dep."), attached hereto as Exhibit Q,

10:6-9; Davis Dep., Ex. M, 51:16-52:9). Ms. Davis told Mr. Connor that Mr. Jackson

was accessing gun websites. (Davis Dep., Ex. M, 52:10-53:5). She told Mr. Connor that:

(1) Mr. Jackson was under a performance management plan, and was not succeeding on

that plan; (2) he was upset about being performance managed; (3) he had rejected an

offer of another position that was suited to his skill set; and (4) those facts, combined

with Mr. Jackson visiting gun websites, had caused employees to be concerned about

their safety. (Connor Dep., Ex. Q, 18:21-20:11; 27:23-28:15). In response, Mr. Connor

asked Ms. Davis for recommendations on how best to handle the matter. As a result, Ms.

Davis called PLANCO's in-house employment counsel, Ian Veitzer, to discuss the

situation. (*Id.* at 20:18-23).

PLANCO then placed Mr. Jackson on leave pending an investigation. (Davis

Dep., Ex. M, 49:15-24). In addition, after telling Mr. Jackson of his status,[10] Ms. Davis

called Alan Hoyt, Chief Technology Officer and Vice President of Information

Technology, to have Mr. Jackson's building and computer access shut off. (Davis Dep.,

Ex. M, 58:3-10). Ms. Davis next called Ms. Vazquez and Mr. Olshevski to let them

know that they did not have to report to the office the next day; they could work from

home if they wished.[11] (Davis Dep., Ex. M, 62:16-63:3).

In the meantime, PLANCO again called Mr. Goumas to investigate the situation.

On May 4, 2007, he interviewed Mr. Jackson by telephone. (Goumas Dep., Ex. L,

---

[10] Mr. Jackson knew that PLANCO ordinarily blocked employee access to firearm websites. As a result, he assumed that his accessing them was the subject of the investigation. (Jackson Dep., Ex. B, 256:24-257:4).
[11] Mr. Olshevski was very concerned about the situation; he took it very seriously. (*Id.*). When he went home, he showed his children a picture of Mr. Jackson and told them that if they ever saw him, they should run. (Olshevski Dep., Ex. D, 91:8-24).

145:11-17).  Mr. Jackson readily admitted he visited gun websites despite knowing that

the Company's internet filter ordinarily blocked access to them.  (Goumas Dep., Ex. L,

124:10-13; *see also* Goumas Notes from Investigation with Jackson, attached hereto as

Exhibit R).  Mr. Jackson also admitted to owning a gun collection, although he refused to

reveal how many guns he had.[12]  (Goumas Declaration ("Goumas Decl."), attached

hereto as Exhibit S, ¶ 5; *see also* Goumas Notes from Investigation with Jackson, Ex. R).

In the meantime, PLANCO discovered from the local police that Mr. Jackson had over

twenty guns, including an Uzi.  (Jamie Davis Declaration ("Davis Decl."), attached

hereto as Exhibit T, ¶ 3).  These facts only caused greater concern.  (Connor Dep., Ex. Q,

33:15-34:22; Goumas Dep., Ex. L, 125:3).

      After several privileged discussions with Mr. Goumas and Attorney Veitzer, Ms.

Davis met with Mr. Connor and presented him with two options for dealing with Mr.

Jackson:  (1) give him a final written warning; or (2) terminate his employment.  (Connor

Dep., Ex. Q, 25:16-26:5; Davis Dep., Ex. M, 66:2-68:11).  Ms. Davis recommended

termination based on safety concerns.  (Davis Dep., Ex. M, 81:12-19).  She viewed the

employees' fears as legitimate.  She could "see it on their face or hear it in their voice

when they're telling you that they are concerned."  (Davis Dep., Ex. M, 70:20-23, 79:7-

80:2; *see also* Goumas Dep., Ex. L, 124:4-125:3).

      After considering the options, Mr. Connor decided to terminate Mr. Jackson's

employment.  (Connor Dep., Ex. Q, 26:6-18).  He focused on the safety of the

employees:

> The priority in my mind is the safety of the people that are here.  In light
> of the timing of the situation and the heightened sensitivity around

---

[12] Even at his deposition, Mr. Jackson refused to reveal how many guns he owns and resisted
attempts to find out what kind of guns he has.  (Jackson Dep., Ex. B, 260:20-262:14).

workplace violence, I just felt that that [termination] was the only decision
I could come to.

(Connor Dep., Ex. Q, 26:13-29:18; *see also* Davis Dep., Ex. M, 52:18-22, 53:23-54:4).

As a result, on May 8, 2007, PLANCO terminated Mr. Jackson's employment.

(*Id.*). Other than Ms. Vazquez's initial report of seeing Mr. Jackson on a gun website,

neither she nor Mr. Olshevski had any involvement in the decision to terminate Mr.

Jackson. (Olshevski Dep., Ex. D, 98:21-99:1, Vazquez Decl., Ex. F, ¶ 7). Because of the

security concerns surrounding Mr. Jackson's termination, PLANCO hired  security

guards for the entrance to its office for the next few weeks. (Davis Dep., Ex. M, 88:16-

89:1).

III.    **ARGUMENT**

    **A.    Mr. Jackson's Claims Are Factually and Legally Deficient**

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment

against a party who fails to offer admissible evidence sufficient to establish the existence

of every element essential to that party's case on which that party bears the burden of

proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 327 (1986) (the "[s]ummary

judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure

the just, speedy and inexpensive determination of every action'") (citation omitted).

Although a defendant bears the initial responsibility of asserting the basis for its motion,

the defendant is not required to negate the plaintiff's claim.  Rather, the defendant must

only point out that there is an absence of evidence to support the plaintiff's case or,

alternatively, offer affirmative evidence which demonstrates that the plaintiff cannot

prove his or her case. *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 69 (3d Cir.

1996); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 171 (3d Cir. 2008)

(*quoting Saldana v. K-Mart Corp.*, 260 F.3d 228 (3d Cir. 2001)).

After the defendant has met its initial burden, the burden is on the non-moving

party to produce <u>specific facts</u> which demonstrate that there is a genuine issue for trial as

to the elements essential to the non-moving party's case. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the court is to view the

evidence in a light favorable to the plaintiff, the mere existence of <u>some</u> alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Rather, the requirement is that there be no genuine issue of <u>material</u> fact. *Id.*; *Charlton v.*

*Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir. 1994), *cert. denied*, 513 U.S. 1022

(1994). To survive a summary judgment motion, therefore, cannot merely rely upon

allegations in the pleadings. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Rather, the

nonmoving party must offer "<u>concrete evidence</u> from which a reasonable [fact finder]

could return a verdict in his favor." *Anderson*, 477 U.S. at 256 (emphasis added);

*Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005). Notably, the non-

movant's perceptions, beliefs, and opinions do <u>not</u> constitute evidence sufficient to defeat

summary judgment. *Marion v. City of Phila.*, No. 00-3553, 2002 WL 351761426, at *2

(E.D. Pa. Dec. 9, 2002).

Applying these standards to the record facts here, no genuine issue of material

fact exists in this case with respect to Mr. Jackson's claims. In the face of his undisputed

violation of Company policy (accessing of prohibited gun websites when he knew that

PLANCO's internet filter was down), Mr. Jackson simply cannot meet his burden of

producing "concrete evidence" that his termination was for some other prohibited reason.

Consequently, PLANCO is entitled to summary judgment in its favor on all of Mr.

Jackson's claims. *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir.

2004).

> **B.      Mr. Jackson Cannot Meet His Burden of Proving That His Employment Was Terminated Because of His Real or Perceived Disability.**

In Counts I and III, Mr. Jackson asserts that PLANCO violated the ADA and/or

PHRA when it allegedly terminated his employment based on his disability or perceived

disability. (Compl., ¶¶ 38-39, 49). To establish a *prima facie* case of disability

discrimination under the ADA and/or PHRA, Mr. Jackson must demonstrate: (1) he is a

disabled person within the meaning of the statute; (2) he is otherwise qualified to perform

the essential functions of the job, with or without a reasonable accommodation; and (3)

he has suffered an adverse employment action as a result of the discrimination.[13] *Skerski*

*v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 2001) (*quoting Deane v. Pocono*

*Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998)).

If Mr. Jackson succeeds in establishing a *prima facie* case of discrimination, the

burden then shifts to PLANCO to articulate a legitimate, non-discriminatory reason for

the challenged employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Assuming PLANCO sets forth such a reason, the burden returns to Mr. Jackson to

produce evidence from which a reasonable fact-finder could conclude that PLANCO's

stated reason is false (or "pretextual"). *Id.* Mr. Jackson can meet this burden by either:

(1) discrediting PLANCO's stated reasons; or (2) presenting evidence that discrimination

---

[13] The standards for claims brought under the PHRA and ADA are the same; courts should analyze the claims coextensively. *Evans v. Maxx-KSD Corp.*, No. 08-1627, 2009 WL 282023, at *2 n. 1 (3d Cir. Feb. 6, 2009) (*citing Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

more likely than not motivated or caused his termination. *Id.* at 764.

Here, Mr. Jackson simply cannot meet his burden. Even assuming Mr. Jackson can establish a *prima facie* case,[14] he has not, and cannot, adduce any evidence from which a reasonable juror could conclude that PLANCO's reason for terminating his employment was pretextual or otherwise indicative of discriminatory animus related to his alleged disability leaves of absence or complaint to Human Resources. Indeed, Mr. Jackson appears to premise his entire claim on his subjective claim that he simply was not a real threat, that his colleagues knew it and, consequently, Mr. Connor's decision was wrong.[15] It is well settled, however, that courts will not second guess a company's business judgment in such cases. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005). This is even more true when the company's judgment involves protecting its employees from potential violence. The unfortunate reality is that in this day and age, an employer cannot risk erring on the side of not acting in a potential violence situation because the consequences of being wrong are just too horrific. Courts simply cannot put

---

[14] Although PLANCO disputes whether Mr. Jackson is substantially limited under the ADA, it will assume for the purposes of this motion that he is. As a result, PLANCO will assume for the purposes of this motion that he can establish a *prima facie* case.

[15] Mr. Jackson attempts to discredit the reason for his termination by arguing that the employees knew of his interest in guns and could not have been legitimately concerned. In support, he points to the fact that Ms. Vazquez had gone to a shooting range with Mr. Jackson and had seen him on gun websites a couple of times in late 2005. (Vazquez Dep., Ex. C, 26:18-28:16). This argument ignores the fact that the situation must be viewed in light of the circumstances at the time. There is an enormous difference between Mr. Jackson viewing a gun website two years earlier when there is no reason to think that he has any animosity against his managers and his viewing a gun website when he is perceived to be increasingly frustrated and angry about being performance managed to the point where he is about to lose his job, when he feels that his managers are discriminating against him and harassing him and has just been told that the company found no evidence to support his allegations, and when the Virginia Tech massacre is still fresh in the headlines. Even Mr. Jackson admits that he does not have evidence that Ms. Vazquez was not concerned for her safety under the circumstances. (Jackson Dep., Ex. B, 353:15-356:2). His argument also ignores the fact that there is no evidence that any of the people actually involved in the termination decision knew that he had accessed gun websites two years earlier.

themselves in a position of second guessing those decisions, and they routinely refuse to do so. *See, e.g., Johnson v. Fulton Concrete Co.*, 330 F. Supp. 2d 1330, 1343 (N.D. Ga. 2004) (holding that the company had set forth a legitimate, non-discriminatory reason for terminating plaintiff as the "company believed that Plaintiff's behavior had caused other employees to feel threatened for their safety."); *Wilkes v. McBee Sys., Inc.*, 181 F.3d 106, 1999 WL 357748, at *7 (6th Cir. 1999) (upholding dismissal where employee related concerns about verbal threats, there was no reason to question this concern, and decision maker knew that plaintiff owned guns and was a good shot); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758-59 (6th Cir. 2000) (upholding employment termination where plant manager knew plaintiff had guns and "felt an obligation to ensure the safety of all plant employees"). *See also Jones v. Johnson & Johnson, McNeil – PPC, Inc.*, No. 94-7473, 1997 WL 549995, at *11 (E.D. Pa. Aug. 22, 1997) ("Indeed, in an era when workplace violence by terminated and other disgruntled employees has been an unfortunate reality, [defendant] could have risked liability to others had it not taken reasonable precautions in these circumstances."). The result should be no different here.

Moreover, PLANCO anticipates that Mr. Jackson may try to prove pretext by pointing to an alleged comparator – Steve Coleman – that he claims PLANCO treated differently. Although Mr. Colman arguably exhibited threatening behavior in the workplace, including raising his voice and berating his supervisor, PLANCO did not terminate him in the same manner as Mr. Jackson. (Olshevski Dep., Ex. D, 80:22-81:19). Any inference that Mr. Jackson may glean from Mr. Coleman's situation, however, is sapped of any probative value by virtue of the undisputed fact that neither Mr. Connor nor anyone in Human Resources was ever made aware of Mr. Coleman's behavior.

16

(Szoke Dep., Ex. P, 28:6-10; Creedon Dep., Ex. K, 42:8-18; Davis Dep., Ex. M, 89:5-14; Connor Dep., Ex. Q, 39:17-23). It similarly is undisputed that the people involved in the Coleman situation had no involvement in Mr. Jackson's situation. Accordingly, it is false logic to assume that a poor decision made several years earlier by a different decision maker somehow stands as evidence that discriminatory animus motivated Mr. Connor's decision.[16] *See Goins v. Echostar Commc'ns, Corp.*, 148 Fed. Appx. 96, 98 (3rd Cir. Aug. 21, 2005); *see also Elston v. UPMC-Presbyterian Shadyside*, No. 2:06-cv-329, 2007 WL 3120291, at *8 (W.D. Pa. Oct. 23, 2007) (holding decision maker's lack of knowledge of allegedly similarly situated Caucasian employees who engaged in confrontational behavior precluded finding of pretext in plaintiff's termination). It is simply legally insufficient to defeat the entry of summary judgment.[17] *Simpson v. Kay Jewelers*, 142 F.3d 639, 645-46 (3d Cir. 1998).

In sum, in the absence of any evidence of an improper motive on the part of Mr. Connor, this Court should not second guess his decision that the potential risk of violence against other employees made it necessary under the circumstances to terminate Mr. Jackson's employment. As with the cited cases, this Court should enter summary judgment in PLANCO's favor on Mr. Jackson's claims of wrongful termination.

---

[16] Further, even if Mr. Connor made the wrong decision, such a poor decision does not make it discriminatory, pretextual, or illegal. *See Van Haste v. Coram Healthcare Corp.*, No. 06-4637, 2008 WL 4513864, at *10 (D.N.J. Oct. 1, 2008) (even if decision to terminate was "wrong or mistaken," that does not raise the inference of pretext); *Kautz*, 412 F.3d at 471 ("Evidence that the method of evaluation an employer used was not the best method does not amount to evidence that the method was so implausible, inconsistent, incoherent or contradictory that it must be a pretext for something else.").

[17] Further, there is no evidence that Coleman was fascinated by guns or had a substantial gun collection. (Vazquez Dep., Ex. C, 57:9-12; Szoke Dep., Ex. P, 52:15-21).

**C.    Mr. Jackson Cannot Meet His Burden of Proving That His Real or Perceived Disability Motivated His Performance Management.**

In Counts I and III, Mr. Jackson also appears to claim that PLANCO discriminated against him by giving him lower performance reviews, which he assumes precluded him from getting quarterly bonuses. (Jackson Dep., Ex. B, 137:14-21, 138:1-5). There is nothing in the record that supports these allegations. Rather, the record clearly establishes that Mr. Jackson's supervisors, Christie Vazquez and Steve Olshevski, carefully documented Mr. Jackson's performance, their expectations for him, and his failure to meet those expectations. Although Mr. Jackson clearly did not agree with certain aspects of these reviews, even he admits that many of them were accurate. For example,

- o  <u>October 9, 2006 Memorandum</u>:  Mr. Jackson admitted that at least some of the examples listed were accurate.[18]

- o  <u>November 2006 Performance Review</u>:  Although Mr. Jackson disagreed with most of the review, he conceded that "there's some truth in [the criticisms] but they swayed it so that it looked as thought I was doing something wrong." Mr. Jackson also agreed with some of the criticisms and areas for development in this review.[19]

- o  <u>January 19, 2007 Memorandum</u>: Mr. Jackson conceded that he failed to deliver three different plans by the time of this memorandum and that these plans were late when he finally delivered them.[20]

- o  <u>February 24, 2007 Memorandum</u>:  Although Mr. Jackson contended that this review was a "picky-type of review," he admitted that items in the memorandum are not incorrect.[21]

In contrast, Mr. Jackson has not produced any evidence other than his own opinion that the performance criticisms were inaccurate or inappropriate.

---

[18] *See* Jackson Dep., Ex. B, 121:2-122:23, 124:15-125:4.
[19] *See* Jackson Dep., Ex. B, 131:10-15; 136:19-137:9, 141:8-14; 149:12-151:7.
[20] *See* Jackson Dep., Ex. B, 195:2-196:24.
[21] *See* Jackson Dep., Ex. B, 210:14-212:5.

Moreover, Mr. Jackson admits that he has no evidence that his mangers gave him poor reviews because of any alleged disability. (Jackson Dep., Ex. B, at 345:10-346:24). Instead, he testified that he bases his claim that his managers reviewed him differently based on his disability because "there was no other thing to base it on." (Id. at 345:24-346:8). He also testified that his belief that the performance plan and the change in the way his managers reviewed him was simply an "interpretation," with no evidence that the plan and change were based on any disability. (Id. at 346:17-24). All he has done is disagree with the judgment of his supervisors and speculate that Mr. Olshevski had a plot to "get rid of him." Even then, he admits he has no evidence that Mr. Olshevski wanted to get rid of him. (Jackson Dep., Ex. B, 347:1-7).

The following exchange from his deposition illustrates that Mr. Jackson's entire claim is based on speculation and conjecture rather than facts and evidence.

> Q.  Now, you said that Christie – earlier you had said that Christie Vazquez was your friend, at some point you viewed her as that. Why do you think that she gave you – and you also said she wrote this review that you did not meet expectations, why do you think that she wrote that?
>
> A.  Because she *probably* was taken into his office and told we want to get rid of Mr. Jackson, you either help us get rid of him or you go.
>
> Q.  And you believe that based on your own speculation or something you've heard?
>
> A.  I *believe* this on my *speculation* and looking at how she changed completely from before he was there and after he was there.

(Jackson Dep., Ex. B, at 165:10-21) (emphasis added).

As a matter of law, speculation and conjecture is insufficient to support a viable discrimination claim. *Hunter v. Rowan Univ.*, 299 Fed. Appx. 190, 194 (3d Cir. 2008) (speculation and conjecture will not withstand a motion for summary judgment); *Nelson*

*v. DeVry, Inc.*, No. 07-4436, 2009 WL 1213640, at *8 (E.D. Pa. Apr. 23, 2009)

(plaintiffs' reliance on belief and speculation in support of their discrimination claim did

not withstand summary judgment); *see also Acumed LLC v. Advanced Surgical Servs.,*

*Inc.*, 561 F.3d 199, 228 (3d Cir. 2009).   As Mr. Jackson clearly has not satisfied his

burden of showing that PLANCO's reasons for his reviews and performance

management were the byproduct of discriminatory animus, this Court should grant

PLANCO's Motion.

**D.      Mr. Jackson Did Not Work in a Hostile Work Environment.**

In Counts I and III, Mr. Jackson also appears to claim that PLANCO harassed him

as a result of his disability.  (Compl., ¶¶ 20, 39, 49).  As with his other claims of

"discrimination," Mr. Jackson cannot establish that he was subject to disability-based

"harassment" much less that the alleged harassment was so severe or pervasive as to

support a finding of a hostile work environment.  *Walton v. Mental Health Ass'n of SE*

*Pa.*, 168 F.3d 661, 667 (3d Cir. 1998).

**1.      Mr. Jackson cannot establish disability-based harassment.**

The first and most critical flaw in his harassment claim is Mr. Jackson's failure to

establish that he suffered any harassment.  As repeatedly noted, he has not and cannot

identify even a single example of any disability related comments being made to or about

him.  In fact, the harassment he alleges is that he was being performance managed.

(Jackson Dep., Ex. B, 240:16-241:19; 345:4-8).  Managing an employee and

documenting his deficiencies, however, is not harassment, it is a manager doing her job.

Regardless, as discussed in detail above, the record indisputably establishes that the

performance management imposed on Mr. Jackson was legitimate and warranted.  There

is no evidence that any alleged disability motivated it.  *See Barclay v. Amtrak*, 240 Fed.

Appx. 505, 508 (3d Cir. 2007) (holding harassment must have occurred due to disability to be actionable). There is simply no basis for his allegation and no evidence to support it.

### 2.   Any alleged harassment was not severe or pervasive.

Even if Mr. Jackson could establish that PLANCO somehow harassed him because of a real or perceived disability, he cannot establish that the alleged harassment was severe or pervasive enough to create an actionable hostile work environment claim. The hallmark element of any viable hostile work environment claim is that the alleged offending conduct be severe or pervasive. *Clayton v. Pa. Dept. of Public Welfare*, No. 05-0768, 2007 WL 575677, at *12 (M.D. Pa. Feb. 20, 2007). Courts must examine all circumstances of the alleged conduct, including the frequency, severity, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance. *Barclay*, 435 F. Supp. 2d at 451 (*quoting Walton*, 168 F.3d at 667). Without evidence of sabotage or more egregious behavior, performance management or reviews simply do not establish the high severe or pervasive standard. *Griffin v. De Lage Landen Fin. Servs., Inc.*, 219 Fed. Appx. 245, 247 (3d Cir. 2007). Accordingly, Mr. Jackson's hostile work environment allegations fail as a matter of law.

### E.    PLANCO Did Not Retaliate Against Mr. Jackson

In Counts I and III of his Complaint, Mr. Jackson alleges that PLANCO terminated him in May 2007 in retaliation for reporting his complaint of harassment/discrimination to Ms. Creedon in March 2007. (Compl, ¶¶ 29, 39). Mr. Jackson's retaliation claim, like his discrimination and harassment claims, is defective. To succeed on his retaliation claim, Mr. Jackson must show: (1) he engaged in protected activity; (2) PLANCO took adverse action against him; and (3) a causal link exists

between his protected activity and PLANCO's action. *Kauffman v. GMAC Mortgage*, 229 Fed. Appx. 164, 169 (3d Cir. 2007). If Mr. Jackson establishes this *prima facie* case, the burden shifts to PLANCO to demonstrate non-retaliatory reason for the adverse action. *Id.* Once this is established, Mr. Jackson again bears the burden of showing that this reason is actually pretext for retaliation. *Id.* Mr. Jackson cannot establish a causal link between his alleged protected activity and his termination or that PLANCO's reason for his termination was pretextual, and, therefore, judgment in PLANCO's favor is warranted.

As with his other claims, Mr. Jackson cannot produce any evidence that PLANCO was retaliating against him. He relies solely on temporal proximity to try to establish the requisite causal link between his complaint to Human Resources and his termination. The Third Circuit, however, has explicitly held that temporal proximity alone is not enough, unless it is unusually suggestive. *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (*quoting Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). Here, the two month window between Mr. Jackson's allegedly protected activity and his termination is not unusually suggestive of discriminatory motive.[22] *Williams v. Phila. Housing Auth. Police Dept.*, 380 F.3d 751 (3d Cir. 2004) (two months is not unusually suggestive); *Zappan v. Pa. Bd. of Probation & Parole*, No. 00-1409, 2002 WL 32174230, at *10 (E.D. Pa. Nov. 25, 2002) (same); *Pritchett v. Imperial Metal & Chem. Co.*, No. 96-0342, 1997 WL 570929, at *4 (E.D. Pa. Sept. 8, 1997) (same).

Rather, the appropriate test is timing plus other evidence put forth by a plaintiff to establish a causal link, which Mr. Jackson fails to do. *Estate of Smith*, 318 F.3d at 513

---

[22] Further, where, as here, the defendant has fully investigated the matter, the suggestiveness of any temporal proximity diminishes. *See, e.g., Stouch v. Twp. of Irvington*, No. 03-6048, 2008 WL 2783338, at *14 (D.N.J. Jul. 16, 2008).

22

(*quoting Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)); *accord Williams*, 380 F.3d at 760. As repeatedly discussed above, Mr. Jackson has no evidence to support his claim. He relies entirely on conjecture that PLANCO wanted to "get rid of" him. (Jackson Dep., Ex. B, 346:9-15). Nowhere in the record does he link PLANCO's alleged desire to get rid of him to his report of harassment or discrimination. To the contrary, he alleges that Mr. Olshevski instructed Ms. Vazquez to "get rid" of him by performance managing him, which began before he made any complaints to Human Resources. (*Id.* at 165:3-21). Clearly, something that started before a complaint is made cannot be in retaliation for a subsequent complaint.

Mr. Jackson's alternative argument is that his termination must have been in retaliation for complaining to Human Resources because before doing so, he had accessed such websites without consequence. (Compl., ¶ 29). As discussed in detail above, there is no evidence that his termination was based on anything other than Mr. Connor's conclusion that under the circumstances here, Mr. Jackson presented a potential threat to the safety of the other PLANCO employees. Mr. Jackson's bald assertion of retaliation without more is insufficient as a matter of law to avoid the imposition of summary judgment in PLANCO's favor.

Further, even if Mr. Jackson could establish a link between his complaint to Ms. Creedon and his termination, his claim would still fail. Mr. Jackson's conduct on May 2, 2007 – knowingly viewing blocked gun websites when the filter was down – constitutes an intervening event that severed any causal link that might have existed between his termination and a prior protected activity. *See, e.g.*, *Reap v. Cont'l Cas. Co.*, No. 99-1239, 2002 WL 1498679, at *20 (D.N.J. June 28, 2002) ("[I]ntervening unprotected

conduct may sever the putative causal connection between protected activity and an adverse action."); *Ruiz v. Morris County Sheriff's Dept.*, No. 05-1825, 2008 WL 2229851, at *8 (D.N.J. May 28, 2008) (*citing Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998)); *accord Bailey v. Commerce Nat. Ins. Services Inc.*, 474 F. Supp. 2d 577 (D. Del. 2007) (plaintiff's violations of policies and unprofessional conduct justified termination despite her prior complaint). Accordingly, Mr. Jackson's ADA retaliation claim fails.

### F.    Mr. Jackson Can Point to No Evidence of FMLA Retaliation.

In Count II, Mr. Jackson argues that PLANCO retaliated against him for taking FMLA leave in September 2006.[23]  Mr. Jackson, however, cannot establish any causal connection between his taking FMLA leave and any allegedly adverse employment action. *Peter v. Lincoln Technical Inst.*, 255 F. Supp. 2d 417, 445 (E.D. Pa. 2002) (*citing Baltuskonis v. US Airways, Inc.*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999)).

In support, Mr. Jackson asserts that Mr. Olshevski's demeanor changed when he took FMLA leave. Yet, as demonstrated above, the record evidence shows that this allegation is based solely on Mr. Jackson's perception. (Jackson Dep., Ex. B, 109:16-111:17). Subjective perception and speculation simply cannot defeat an otherwise properly supported motion for summary judgment.[24] *Lackman v. Recovery Servs. of N.J., Inc.*, No. 06-2016, 2008 WL 583660, at *10 (D.N.J. Feb. 13, 2008); *Schofield v. Metro.*

---

[23] Mr. Jackson testified that he did not believe he was retaliated against for his prior leave in early 2006. (Jackson Dep., Ex. B, 111:18-22).

[24] The only non-speculative example of a demeanor change that Mr. Jackson could point to was an allegation that Mr. Olshevski would allegedly give him assignments before he left early on certain days for doctors' appointments. (*Id.* at 160:1-161:13). Mr. Jackson conceded, however, that Mr. Olshevski did not tell him to complete the assignments before leaving for the appointments. (*Id* at 162:6-16). Not only is it unclear if this is an adverse employment action, it is unclear what if any connection this alleged behavior has to Mr. Jackson's FMLA leave.

*Life Ins. Co.*, No. 03-0357, 2006 WL 2660704, at *7 (M.D. Pa. Sept. 15, 2006); *Maurizio v. Fox Chapel Foods, Inc.*, No. 04-1168, 2006 WL 2571397, at *11 (W.D. Pa. Sept. 5, 2006). Accordingly, this Court should grant PLANCO's Motion and dismiss Count II.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant PLANCO's Motion for Summary Judgment and enter an order dismissing Plaintiff's Complaint in its entirety.

Respectfully submitted,

*/s/ Darcy Walker Krause*
James N. Boudreau (PA #77891)
Darcy Walker Krause (PA #202511)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321

Attorneys for Defendant
Date: May 15, 2009                        PLANCO, L.L.C.

## CERTIFICATE OF SERVICE

I, Darcy Walker Krause, do hereby certify that I have on May 15, 2009, caused a

true and correct copy of the foregoing Memorandum in Support of Defendants' Motion

for Summary Judgment to be served upon the following via *ECF*:

Mark S. Scheffer, Esquire
Identification Nos. 59271
Law Offices of Mark S. Scheffer
Suite 1B, 50 West Welsh Pool Rd.
Exton, PA 19341


*/s/ Darcy Walker Krause*
Darcy Walker Krause