Mark S. Scheffer, Esquire
LAW OFFICES OF MARK S. SCHEFFER
Suite 1B
50 West Welsh Pool Rd.
Exton, PA 19341                                    Attorney for Plaintiff
(610) 594-1550

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONY JACKSON | : | CIVIL ACTION |
| | : | |
| v. | : | No. 08-5144 |
| | : | |
| PLANCO | : | |
| | : | JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

On April 24, 2007 Gregg Goumas, a Hartford employee who was investigating Plaintiff's internal complaint made to Human Resources of disability discrimination or mistreatment based on his medical condition or leaves of absence he took for that condition, interviewed Christie Vazquez and Steve Olshevski about Plaintiff's allegations of discrimination. Deposition of Gregg Goumas ("Goumas Deposition"), pages 30-31, 39, 51 and P-1 attached thereto (excerpts and exhibits from the Mr. Goumas's deposition are attached hereto as Exhibit 1); Deposition of Mary Creedon ("Creedon Deposition"), page 14 (excerpts from the Creedon Deposition are attached hereto as Exhibit 2). Both Ms. Vasquez and Mr. Olshevski were Plaintiff's supervisors, and were the focus of the internal discrimination complaint that Plaintiff made, which concerned their performance

management of him. *See* Declaration of Mary Creedon, paragraph 3,6 (Ms. Creedon's declaration is attached as Exhibit A to Defedant's Memorandum of Law). Both were aware of Mr. Jackson's complaint when Mr. Goumas spoke with them. Goumas Deposition, Exhibit 1, pages 57-8.

On April 30, 2007 Mr. Goumas contacted Plaintiff and informed him of the results of the investigation, which Mr. Goumas did not believe supported Mr. Jackson's allegations. *See* Declaration of Mary Creedon, paragraph 7. Two days later on May 2, and about one week after she was interviewed by Mr. Goumas regarding Mr. Jackson's complaint, Ms Vasquez contacted a Human Resources employee, Jamie Davis, to inform her of alleged safety concerns she had regarding Mr. Jackson. Deposition of Jamie Davis ("Davis Deposition"), pages 38-39, 73 and P-29 attached thereto (excerpts and exhibits from the Ms. Davis's deposition are attached hereto as Exhibit 3). Mr. Jackson was terminated the following week as a result of Ms. Vasquez's professed concerns.

Plaintiff has asserted claims of disability discrimination[1] in violation of the American's With Disabilities Act of 1990, as amended, 42 U.S.C. §12101, *et seq*. ("ADA") and the Pennsylvania Human Relations Act, as amended, 43 P.S. §951 *et seq*. ("PHRA"), and of retaliation in violation of the ADA, PHRA and the Family & Medical Leave Act of 1993, 29 U.S.C. §2601, *et seq*. ("FMLA"). Defendant now moves for summary judgment on those claims.

For the reasons expressed below, Plaintiff requests that that motion be denied.

---

[1]   For purposed of this motion, Defendant does not contest Plaintiff's claim that he is disabled and within the group protected by the relevant federal and state statutes prohibiting discrimination on the basis of disability or handicap. *See* Defendant's Memorandum in Support of its Motion, page 15 fn.14.

## II.    FACTUAL BACKGROUND

### A.    Mr. Jackson's Friendly Disposition and the Absence
### Of Any Violent or Threatening Behavior by Him

Mr. Goumas described his conversations with Human Resources VP Mary

Creedon about Mr. Jackson with reference to his discussion of offering Mr. Jackson an

alternative, lesser position at the conclusion his investigation of Mr. Jackson's

discrimination compliant as follows:

> You know, she raised it in the context of, you know, people liked Tony. They
> did. As I indicated before, you know, he's funny. I mean, he was generally a
> nice guy.

Goumas Deposition, Exhibit 1, page 112. Plaintiff's supervisors, Ms. Vasquez and Mr.

Olshevski, also testified as to Plaintiff's friendly nature, with Ms. Vasquez describing

herself as a "friend" of Mr. Jackson right up until the last time she saw him at work, and

Mr. Olshevski indicated that he never saw Mr. Jackson exhibit any violent tendencies,

and described Mr. Jackson as "friendly," though adding that he thought he was "quirky"

and "unusual."  Deposition of Christie Vazquez ("Vazquez Deposition"), page 14

(excerpts from the Vazquez Deposition are attached hereto as Exhibit 4); Deposition of

Steven Olshevski ("Olshevski Deposition"), page 88 (excerpts from the Vazquez

Deposition are attached hereto as Exhibit 5).

Though it was not revealed by Ms. Vazquez – nor was there an attempt to elicit

such relevant information by either Ms. Davis or Mr. Goumas (who didn't even speak to

Ms. Vasquez), both of whom were involved in investigating Ms. Vazquez's claims -

when she contacted Ms. Davis about alleged safety concerns about Mr. Jackson, Ms.

Vazquez's friendship with Mr. Jackson included his accompanying her when she went to

see apartments in Philadelphia out of concerns for her safety, and his taking Ms.

Vazquez's shooting when she, in the words of co-worker Matt Szoke, sought Mr.

Jackson's assistance when she was interested in a "gun for self-protection," a "handgun"

or "something of that nature." Vazquez Deposition, Exhibit 4, pages 21-22; Deposition of

Tony Jackson ("Jackson Deposition"), pages 90-92 (excerpts from the Jackson

Deposition are attached hereto as Exhibit 6); Deposition of Matt Szoke ("Szoke

Deposition"), pages 54-55 (excerpts from the Szoke Deposition are attached hereto as

Exhibit 7).

All of the deponents who have testified in this matter have consistently and

without contradiction testified either that Mr. Jackson did not exhibit any threatening or

violent behavior or that they were not aware of any such behavior. Goumas Deposition,

Exhibit 1, pages 135,139; Creedon Deposition, Exhibit 2, pages 18-19, 23;  Vazquez

Deposition, Exhibit 4, page 36; Olshevski Deposition, Exhibit 5, page 88; Szoke

Deposition, Exhibit 7, page 55. Ms. Creedon described Mr. Jackson as "offended" or

"angry" when she presented him with the offer of an alternative position on during the

April 30, 2007 discussion with Mr. Goumas of the findings by him regarding Mr.

Jackson's discrimination complaint, yet there is no indication in her contemporaneous

notes of that discussion of Mr. Jackson being angry or offended; rather, her notes say that

Mr. Jackson responded to the offer, "[t]hank you, but no." Creedon Deposition, Exhibit 2,

page 39. Significantly, Ms. Davis was also present at that discussion and described Mr.

Jackson as exhibiting "little emotion" and that "[h]e probably thanked Gregg for his

work. *He was always polite in that way*," adding that Mr. Jackson did nothing out of the

ordinary at the meeting. Davis Deposition, Exhibit 3, pages 31-32.

Examples of Mr. Jackson's consistently polite and agreeable behavior were his

reaction when he was given his negative performance appraisal by Mr. Olshevski and when Ms. Davis called him at home to tell him he was suspended after Ms. Vazquez's profession of safety concerns. In the first instance, Mr. Jackson expressed undestanding of management concerns, agreed as to areas for development and the plan to move forward, and in the second instance he acted "surprised" and merely said "ok," without exhibiting any anger. Olshevski Deposition, Exhibit 5, page 51; Davis Deposition, Exhibit 3, pages 57-58.

Defendant opposes to this solid testimony Ms. Vazquez's bald statement in her declaration that Mr. Jackson was growing increasingly irritated with his performance management and that she "perceived that he was angry about being performance managed" by "early 2007" - the timing of which, coupled with her knowledge of Mr. Jackson's affection for firearms (somewhat shared) and past visiting of internet retail sites selling guns as early as 2005, renders dubious her profession that safety concerns regarding Mr. Jackson suddenly surfacing in May of 2007 right after her interview with Mr. Goumas on April 24th about Mr. Jackson's discrimination complaint, as addressed more fully below. This statement, which at best only indicates an employee with no violent tendencies or history being irritated and angry at being performance managed, a very normal, sane human reaction, is insufficient to overcome the obvious and very rational inference that Mr. Jackson did not pose the safety threat that was conveniently advanced by Ms. Vazquez, and conveniently accepted by Defendant, in an attempt to justify Mr. Jackson's termination.

**B.     Know or Discoverable Facts Which Indicate That Mr. Jackson Was Not A Safety Threat**

An investigation conducted with an objective view into Ms. Vazquez's allegations

to determine whether or not Mr. Jackson really posed a safety threat would have discovered a lot of readily available information that would have shown her professed belief that he was to be unreasonable. In addition to the above concerning Mr. Jackson generally friendly disposition, it was well known throughout Mr. Jackson's employment that he was a know gun enthusiast who had visited websites related to that interest throughout his employment, and prior to and throughout the six month period when he was being performance managed by Mr. Olshevski and Ms. Vazquez – without any expression of violent tendencies or explicitly or implicitly threatening behavior.

Indeed Ms.Vazquez herself was aware of Mr. Jackson's interest in guns throughout her employment with the company and, as indicated by the testimony of Mr. Szoke noted above, shared Mr. Jackson's interest in guns to some extent. Ms. Vazquez had engaged in debates with Mr. Jackson about gun rights with other employees, including a prior supervisor of her and Mr. Jackson, Eric Paladino. Vazquez Deposition, Exhibit 4, pages 17-20. Ms. Vazquez had observed Mr. Jackson viewing internet gun sites well before her profession of safety concerns regarding Mr. Jackson. Vazquez Deposition, Exhibit 4, pages 26-29. She recounted that she didn't tell anyone about it because Mr. Jackson "made it very obvious he was doing it." Id. at page 27. Mr. Vazquez had observed Mr. Jackson viewing the very same time of handgun sites previously as the ones he observed him viewing before she came forward with her safety concerns approximately a week after she spoke to Mr. Goumas pursuant to his investigation of Mr. Jackson's complaint of discrimination. Id. at pages 28-9. Yet there was no exhibition of violent behavior or threats made by Mr. Jackson to Ms. Vazquez or anyone else during Mr. Jackson's employment. Indeed, Ms. Vazquez and Mr. Jackson were friends who

socialized outside of work, which included their going shooting together and Mr. Jackson accompanying Ms. Vazquez while apartment hunting in Philadelphia, during the same period that Mr. Jackson was surfing gun sites at work in accordance with his well-known interest in guns.

As Mr. Szoke also testified, it was known that Mr. Jackson possessed firearms and that Mr. Jackson openly discussed that at work. Szoke Deposition, Exhibit 7, page 51. The following testimony indicates the level of the known interest of Mr. Jackson in guns and his viewing of gun sites:

Q.  Was it generally known about him visiting gun sites?

A.  **It was generally known that Mr. Jackson was a gun enthusiast and owns lots of guns, and I'm assuming, I think that people knew that that's what it was related to.**

Id. at pages 72-3 (emphasis added).  Mr. Szoke also confirmed that there were "friendly" discussions about guns and Second Amendment issues, and that both Ms. Vazquez and Mr. Jackson participated in those discussions. Id. at pages 46-7, 51.

Unfortunately for Mr. Jackson, the only coworkers Ms. Davis spoke with regarding Ms. Vazquez's profession of his being a safety threat were his supervisors Ms. Vazquez and Mr. Olshevki.  Mr. Goumas, the appointed "investigator" of the allegations, didn't even bother speaking with Ms. Vazquez, who made the complaint, and did not even inquire as to who made the complaint; and he didn't speak with Mr. Olshevski either. Davis Deposition, Exhibit 3, pages 80, 85; Goumas Deposition, Exhibit 1,  pages 130-31. As detailed below, the person who made the decision to terminate Mr. Jackson, Kevin Connor, didn't talk to Ms. Vazquez or any other co-workers about the *bona fides* of Mr. Jackson actually being threat. Deposition of Kevin Connor, pages 16-18, 23-4

(excerpts from the Connor Deposition are attached hereto as Exhibit 8).  Ms. Davis, although not the one charged with investigating the matter (Mr. Goumas was),  could have gathered some of this information from Ms. Vazquez, but she failed to ask the relevant questions, as detailed below.

Of course, Mr. Jackson did tell both Ms. Davis of a deep interest which would readily explain his interest in guns and his surfing a gun site at work apart from any falsely ascribed intent by this non-violent and friendly man to purchase a gun with malice toward Mr. Olshevski or his friend, Ms. Vazquez – ignoring for the moment the obvious fact that he already possessed an abundance of firearms and did not need to purchase another one if he wished to carry out any malicious intent toward anyone.  As Ms. Davis' contemporaneous notes indicate:

> **Tony said he's a firearms instructor and taught people in IT how to shoot. He's licensed in 28 states to carry a concealed weapon, and he has top secret security clearance.**

Davis Deposition, Exhibit 3, page 74 and P-29 attached thereto. Ms. Davis said she had no reason to doubt the truth of any of that information. Id. at 74-5.  Mr. Goumas also indicates that Mr. Jackson told him about his license to carry a concealed weapon and about his security clearance. Goumas Deposition, Exhibit 1, pages 137-8. Consistent with Mr. Jackson's background with, and interest in, guns, Mr. Jackson also told Mr. Goumas that he was looking at gun sites (including a site called Mossberg.com) with an eye toward purchasing an adjustable stock for a Mossberg shotgun that his wife owns and wanted to use for skeet shooting. Jackson Deposition, Exhibit 6, pages 250-51.

Ms. Vazquez also claims in paragraph 5 of her declaration submitted by Defendant in support of its motion that Mr. Jackson, "[b]y early 2007," was becoming

irritated and angry about being performance managed. Indeed, he had been being

performance managed for some six months prior to Ms. Vazquez coming forward with

her alleged concern that he was a safety threat. Vazquez Deposition, Exhibit 4, page 26.

At the time that Ms. Vazquez did come forward with her allegations, Mr. Jackson had not

been given any type of discipline since his complaint of discrimination, and in fact Mr.

Jackson was in a very good frame of mind and felt he had been able to get his work done

during that time period, during which "there were no problems with Christie and it was a

100 percent better environment." Jackson Deposition, Exhibit 6, page 236.

       Nonetheless, Defendant credited Ms. Vazquez's professed concern that Mr.

Jackson, who had owned guns and been a gun enthusiast visiting gun sites throughout his

employment, and who had been subject to performance management by Mr. Olshevski

and Ms. Vazquez for approximately 6 months, had suddenly become a safety threat and

needed to be terminated and barred from the premises.

       **C.    Ms. Vazquez's Report of Mr. Jackson Visiting Gun Sites,
              and Alleged Safety Concern Regarding Mr. Jackson**

       On May 2, 2007, less than a week after she spoke with Mr. Goumas about Mr.

Jackson's discrimination complaint, and a few days after Defendant had closed that

complaint and spoken with Mr. Jackson about its findings, Ms. Vazquez met with Ms.

Davis to discuss written warnings regarding Mr. Jackson. After speaking with Ms. Davis

about performance issues concerning Mr. Jackson, Ms. Vazquez at the "end of the

meeting" stated, "I don't even know if I should bring this to your attention, but I noticed

that Tony was on websites today." Davis Deposition, Exhibit 3, page 45. She told Ms.

Davis that she saw pictures of guns on the websites, and that she was concerned for

herself, "but more concerned for Steve."[2] Davis Deposition, Exhibit 3, page 46.   When

Ms. Vazquez had called Ms. Davis to arrange the meeting, she had not mentioned any

concern about Mr. Jackson viewing the websites, or of any safety concerns. Davis

Deposition, Exhibit 3, page 40.

     Ms. Vazquez told Ms. Davis that she had a concern because she witnessed Mr.

Jackson "surfing gun sites," and that he "was an NRA member." Vazquez Deposition,

Exhibit 4, page 31. She added that she "didn't know if her concern was valid." Id. She

said she was concerned because she had write-ups to give Mr. Jackson, and she was

"afraid." Id. The write-ups were never given to Mr. Jackson. Id.

     Ms. Vazquez indicated that she did not recall if Ms. Davis had asked her whether

she had witnessed Mr. Jackson viewing gun sites before. Id. She also did not recall

whether she told Ms. Davis that she had (of course, she had, as noted above). Id. Ms.

Vazquez indicated that she did tell Ms. Davis that she was aware of Mr. Jackson owning

guns, but Ms. Davis did not ask her how she was aware of that nor how long she had

been aware of that. Id. Ms. Vazquez never spoke with the investigator of the safety

concerns and website usage of Mr. Jackson, Mr. Goumas, nor to the person who made the

decision to fire Mr. Jackson, Kevin Connor. Id. at pages 34-5.

     Ms. Vazquez had not spoken about any safety concerns with Mr. Olshevki prior

to reporting Mr. Jackson. Vazquez Deposition, Exhibit 4, pages 30-31. After speaking

with Ms. Davis, Ms. Vazquez spoke with Mr. Olshevski, and recounted her conversation

as follows:

     Q.  Did Steve indicate to you in any way whether he was concerned or scared of

---

[2]   Mr. Olshevski testified that Ms. Vazquez told him that she was concerned "for her
safety." Olshevski Deposition, Exhibit 5, page 95.

Tony or concerned about Tony being a possible threat?

A.  Yes.

Q.  What did Steve say?

A.  **He mentioned the joke about his kids.**

Q.  What do you mean joke?

A.  He had said – you know, he showed a picture of his kids to – or showed, you know, if you see this guy type deal. Because I asked him if he was afraid.

Vazquez Deposition, Exhibit 4, page 36 (emphasis added).

> **D.      The Flawed Investigation of Ms. Vazquez's Report**
> **And the Termination of Mr. Jackson**

Though Ms. Davis was involved as the person – the only person in fact of those Involved in either the investigation or the termination, which included Mr. Goumas, the investigator, and Mr. Connor, the decision maker – who spoke with both Ms. Vazquez and Mr. Olshevski, she testified that she "was not the one to do the investigation on this" when she was asked whether she had questioned Mr. Jackson if he had visited the sites before with his supervisor's knowledge, and she clearly stated that it was Mr. Goumas's investigation, and that her role was that of running a report and passing it on. Davis Deposition, Exhibit 3, pages 80-81, 85. Mr. Connor nonetheless indicated that he relied upon Ms. Davis and the information she provided in making his decision. Connor Deposition, Exhibit 8, pages 26-7. Mr. Connor never spoke with the investigator, Mr. Goumas. Id. at page 24.

As noted above, Ms. Davis did not ask Ms. Vazquez about how long she knew that Mr. Jackson owned firearms when Ms. Vazquez told her that she was aware of that. Ms. Davis believes that she told Mr. Goumas that Ms. Vazquez made the initial

complaint, yet Mr. Goumas did not speak with Ms. Vazquez. Davis Deposition, Exhibit 3, page 66; Vazquez Deposition, Exhibit 4, page 34; Goumas Deposition, Exhibit 1, pages 130-31. Ms. Davis indicated that Mr. Olshevki told her that Mr. Jackson was a "gun enthusiast," but she did not talk to Ms. Vazquez about that. Davis Deposition, Exhibit 3, pages 81-2. She stated that she did not ask Ms. Vazquez whether she had seen Mr. Jackson visit gun sites before. Id. at page 62.  Ms. Davis also did not ask Mr. Olshevski if he has witnessed any violent tendencies in Mr. Jackson, or if Mr. Jackson had done anything to make him feel threatened. Olshevski Deposition, Exhibit 5, page 98.

Mr. Goumas did not speak with any of Mr. Jackson's co-workers as to Mr. Jackson's interest in guns, and did not talk to any co-workers as to whether Mr. Jackson was any kind of threat. Goumas Deposition, Exhibit 1, pages 137, 139.  In addition to not speaking with Ms. Vazquez and others, Mr. Goumas did not even bother to view the sites Mr. Jackson visited, despite that fact that he was the one given the role of conducting the investigation as to whether Mr. Jackson violated the internet or Electronic Communications policy. Id. at 120, 135-6.

Mr. Connor, who made the decision to terminate Mr. Jackson, was informed by Ms. Davis that Mr. Jackson had made a complaint of discrimination, but Mr. Connor made no effort to look into the timing issues concerning that complaint of otherwise look at Mr. Jackson's personnel file. Connor Deposition, Exhibit 8, pages 32-33, 39. Like Mr. Goumas, Mr. Connor had no interest in looking at the websites actually viewed by Mr. Jackson, which he didn't do, and he had no interest in talking to the employee who made the complaint, Ms. Vazquez (whom he didn't talk to), whose identity he didn't even ask

or know of at the time, similar to Mr. Goumas. Connor Deposition, Exhibit 8, pages 16-17, 35-6. Mr. Connor did not talk with either Mr. Goumas or Mr. Olshevski pursuant to his decision, either. Connor Deposition, Exhibit 8, page 24.

Mr. Connor testified that he was given the option of either giving a written warning to Mr. Jackson or terminating him. Connor Deposition, Exhibit 8, page 26. Mr. Connor decided to terminate Mr. Jackson rather than give a warning because of a priority for safety and a heightened sensitivity about workplace violence at the time, and "felt that that was the only decision [he] could come to." Id. He considered Mr. Jackson's viewing of the websites as "the catalyst" as to why he considered Mr. Jackson a safety threat. Id. at pages 28-9.

While he was not aware of these facts, Mr. Connor testified that it would not have mattered to him as to whether Mr. Jackson was a safety threat or not that his managers were aware that Mr. Jackson had an interest in guns throughout the period they were performance managing him. Connor Deposition, Exhibit 8, pages 29-30. He also stated that it did not matter to him that Mr. Jackson had a background in protection and security services. Id. at page 30. He didn't even know if anyone had spoken to Mr. Jackson about his interest in guns. Id. Finally, he did not consider it relevant to his decision as to what type of discipline to give Mr. Jackson that managers had permitted him to view gun sites in the past. Id. at page 38.

### E.    The Internet Policy Was Not Enforced and Mr. Jackson Was Treated Differently than Others

Mr. Goumas testified that Mr. Jackson violated the Electronic Communications

Policy of Defendant by "visiting, downloading or distributing inappropriate material."[3]

Goumas Deposition, Exhibit 1, page 162 and P-12. The policy does not define

"inappropriate" per se, but does identify as a violation of the policy sending or displaying

or storing any material "that is offensive, obscene, derogatory or disparaging and that is

based on an individual's sex, race, color, religion, age, national origin, marital status,

ancestry, sexual orientation, veteran status, disability, pregnancy or citizenship status."

Exhibit 1, P-12. Perhaps because a retail gun site does not come within those terms, Mr.

Goumas identified the sites Mr. Jackson viewed as "inappropriate" because they are

blocked by Hartford, which he says indicates they are deemed inappropriate by that very

fact.[4] Goumas Deposition, Exhibit 1, pages 162-65. As to how one is to know if the

content of a site is inappropriate beyond just being blocked, Mr. Goumas indicated that

an employee would know that based on "[c]ommonsense," the employee's commonsense

based on "what we would expect of our employees." Id. at 177-78.

    Mr. Jackson had been viewed by both Ms. Vasquez and his prior manager (Mr.

Paladino) viewing gun sites, and Mr. Paladino had permitted such conduct. Vazquez

Deposition, Exhibit 4, pages 27, 59. As far as viewing blocked sites being inappropriate

and violating the policy, Ms. Vazquez also viewed blocked sites when the filter was

down, and visiting blocked sites when the filter was down something done "within the

department." Id. at 57-59. Ms. Vazquez indicates that there was no discussion with Mr.

---

[3]    The policy identified by Defendant as the Planco policy (referenced above) is not the
policy in the handbook provided to Mr. Jackson, which says that "downloading,
dispersion of inappropriate material and/or pornography is grounds for immediate
termination." Mr. Jackson disputes that P-12 is the policy applicable to him. Jackson
Deposition, Exhibit 6, page 278-84. In any event, Mr. Jackson did not violate even P-12
as that policy is applied in practice by Defendant, as demonstrated below.
[4]    Nothing in the policy P-12 makes any reference to "blocked sites." Goumas
Deposition, Exhibit 1, pages 170-71.

Jackson about a different understanding as to the internet policy after Mr. Olshevski became manager. Vazquez Deposition, Exhibit 4, pages 59-60.   As Mr. Jackson testified, the policy "wasn't enforced," and that "people in my department have been going to sites all the time since I was there and there have never been an issue raised," and they have gone to blocked sites without being terminated or questioned.  Jackson Deposition, Exhibit 6, pages 270-71, 273-74, 277-78. It was something that was done in the department, and had never been an issue. Jackson Deposition, Exhibit 6, pages 245-46. Indeed, Mr. Jackson say Ms. Vazquez visit a blocked site, Facebook, the very day he visited the gun sites for which he was terminated. Jackson Deposition, Exhibit 6, pages 247, 249.

Mr. Szoke, a team leader similar in position to Ms. Vazquez, being one of Mr. Olshevki's managers and direct reports, confirms the way the policy was not applied in practice. Olshevski Deposition, Exhibit 5, page 14,15, 78, 100. Mr. Szoke testified that he would be responsible to contact Hartford if the filter was down, and that is was "amazing" how quickly people learned of that. Szoke Deposition, Exhibit 7, pages 74-5. Once people in the department found that out the filter was down, they would go to normally blocked sites and it would become a "free-for-all." Id.

Mr. Jackson, in viewing the retail gun sites he had viewed previously with the knowledge of his supervisors, did not act any differently than his co-workers and even his manager, Ms. Vazquez, in viewing those "blocked" sites, and, like them, he did not violate the internet policy of Defendant.

## II.    LEGAL ARGUMENT

### A.    The Summary Judgment Standard

Defendant does not challenge, for purposes of this motion, whether Plaintiff has met his initial burden of establishing a *prima facie* case under the ADA or PHRA for purposes of his disability discrimination claim regarding his termination.[5] *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment, page 14 n.13 and page 15 n.14. Once Plaintiff has met that burden, the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for its action, which Defendant has.

　After a defendant has proffered a legitimate, nondiscriminatory explanation, a plaintiff may survive summary judgment by (1) presenting sufficient evidence to "meaningfully throw into question, i.e., to cast sufficient doubt upon," the employer's reasons, or (2) coming forward with sufficient evidence that the jury could reasonably conclude that a discriminatory motive was a determinative cause of the employment decision.  *Fuentes*, 32 F.3d at 765.  A plaintiff may do this by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a factfinder *could* rationally find them 'unworthy of credence.'" *Sheridan v. E.I. DuPont De Nemours & Company*, 100 F.3d 1061, 1072 (3rd Cir. 1996) (en banc) (citation omitted).   As the Supreme Court noted in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d

---

[5]    Defendant does apparently challenge Plaintiff's *prima facie* case for his retaliation case under the ADA, PHRA and FMLA, and that aspect of his claim will be addressed in Plaintiff's argument regarding the sufficiency of his retaliation claims. Though Defendant addresses the issue of a hostile environment and discrimination apart from the termination, Plaintiff does not assert such claims.

105 (2000):

> "'[I]t is *permissible* for the trier of fact to infer the ultimate fact of
> discrimination from the falsity of the employer's explanation.
> Specifically, we stated:
>> "The factfinder's disbelief of the reasons put forward by the
>> defendant (particularly if disbelief is accompanied by a suspicion
>> of mendacity) may, together with the elements of the prima facie
>> case, suffice to show intentional discrimination. Thus, rejection of
>> the defendant's proffered reasons will *permit* the trier of fact to
>> infer the ultimate fact of intentional discrimination." *Id*., at 511,
>> 113 S.Ct. 2742.'"

530 U.S. at 147, 120 S.Ct. at 2108 (emphasis in original).

The *Reeves* Court went on to acknowledge the efficacy of circumstantial evidence

to attack an employer's rationale, stating that:

> "'Proof that the defendant's explanation if unworthy of credence is simply
> one form of circumstantial evidence that is probative of intentional
> discrimination, and it may be quite persuasive. See *id*., at 517, 113 S.Ct.
> 2742 ("[P]roving the employer's reason false becomes part of (and often
> considerably assists) the greater enterprise of proving that the real reason
> was intentional discrimination"). In appropriate circumstances, the trier of
> fact can reasonably infer from the falsity of the explanation that the
> employer is dissembling to cover up a discriminatory purpose. Such an
> inference is consistent with the general principle of evidence law that the
> factfinder is entitled to consider a party's dishonesty about a material fact
> as "affirmative evidence of guilt." . . . Moreover, once the employer's
> justification has been eliminated, discrimination may well be the most
> likely alternative explanation, especially since the employer is in the best
> position to put forth the actual reason for its decision. Cf. *Furnco Constr.
> Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed2d 957 (1978)
> ("[W]hen all legitimate reasons for rejecting an applicant have been
> eliminated as possible reasons for the employer's actions, it is more likely
> than not the employer, who we generally assume acts with *some* reason,
> based his decision on an impermissible consideration"). Thus, a plaintiff's
> prima facie case, combined with sufficient evidence to find that the
> employer's asserted justification is false, may permit the trier of fact to
> conclude that the employer unlawfully discriminated.'" 530 U.S. at 147-
> 148, 120 S.Ct. at 2108-2109 (citations omitted, emphasis added).

The jury, applying common sense and experience, is given the burden of

determining whether the inference of discrimination is warranted, and "where the only

evidence of intent is oral testimony, a jury could always choose to discredit." *Sheridan*, 100 F.3d at 1071-72 (citations omitted).  In order for the Court to pretermit the jury's traditional role, it must hold that all the relevant evidence of Defendant's intent would not support a rational finding of Defendant's discriminatory motive in terminating plaintiff. In deciding whether there are any genuine issues of fact which would support such a rational finding, the Court must draw all reasonable inferences in favor of the non-moving party.  *Hancock Industries v. Schaeffer*, 811 F.2d 225 (3rd Cir. 1987).

The Third Circuit has recognized that, burdened often with the absence of direct evidence of the "employer's mental processes," people claiming that their employer has deprived them of their employment because of a discriminatory motive present cases which "are uniquely difficult to prove and often depend upon circumstantial evidence." *Sheridan*, 100 F.3d at 1071 (3rd Cir. 1996) (citations omitted).  The *Sheridan* Court "recognized that 'discrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered.'" *Id.* at 1071  (citation omitted).  The Third Circuit has also recognized that  "discrimination  . . . is often subtle" and that "[a]n employer who knowingly discriminates  . . . may leave no written records revealing the forbidden motive and may communicate it orally to no one."  *Id.* (citations omitted).

At the end of a maze filled with the prima facie case, presumptions, burden shifting, and pretext remains the ultimate determination:  "whether the inference of discrimination is warranted."  *Sheridan*, 100 F3d at 1071.  The peculiar standards and mode of proof established in employment cases was developed to level the playing field where the employer possesses control over witnesses, documentary evidence, and the

expression of its ultimate motivation.  The law proscribes discrimination, but it has "difficulty achieving this goal because it is so easy to concoct a plausible reason for . . . firing . . . a worker who is not superlative."  *Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987).

### B.    Plaintiff Has Come Forward with Sufficient Evidence of Pretext on His Disability Discrimination Claim

Since Defendant has conceded Plaintiff's *prima facie* case as to his disability claim, the only issue before the court on this claim is whether a reasonable jury can find pretext. In other words, Plaintiff need only present enough evidence to "meaningfully throw into question, i.e, to cast sufficient doubt upon," Defendant's contention that Plaintiff was a safety threat who needed to be terminated to protect its empoyees. Stated variously, Plaintiff must point to enough evidence of weakness, implausibility, inconsistency or contradiction in Defendant's claim that Mr. Jackson was a safety threat as to support a reasonable inference that it is "unworthy of credence."

There are many reason why a rational fact finder might believe the contention that Plaintiff was a safety threat to be unworthy of credence. The very people essential to that determination by Defendant, Mr. Goumas and Mr. Connor, made absolutely no effort to speak with Ms. Vazquez, and made no effort to even view the gun sites that Mr. Jackson viewed. Not only did they fail to speak with Ms. Vasquez, neither even questioned who the employee who reported Mr. Jackson was, and they didn't even know her identity. A reasonable person would think that, at a minimum, someone acting in good faith on this issue would want to know something about the person who reported the safety concern and the content of the websites that allegedly triggered the report.

There are many facts that they failed to learn simply because, it is submitted, they

didn't want to find them out, preferring to be isolated from them so that their use of the ready made justification advanced to terminate an employee who had raised legal issues as to his treatment would appear to be reasonable.[6] One of the more significant facts that they would have learned if they had even bothered to ask the identity of the employee who reported Mr. Jackson was that that employee was one of the supervisors whose performance management of Mr. Jackson was being challenged, and had in fact been interviewed by Mr. Goumas himself as to the substance of Mr. Jackson's complaint about 1 week before she made the profession of being concerned for her safety.  The fact would cause a reasonable person to queston Ms. Vazquez's motivation, especially in light of other facts, such as Mr. Jackson's know interest in, and legal use and experience with, guns, with no indication of a malign motive on Mr. Jackson's part, which could have been uncovered in an investigation undertaken with due diligence and a concern for truth.

Had they taken a real interest in the truth of the matter of whether Mr. Jackson was a real safety threat, they may have found out that Ms. Vazquez had seen Mr. Jackson viewing these same gun sites through out his employment – without incident, or anyone being threatened in any manner. They may have learned of Ms. Vazquez's friendship with Mr. Jackson, of his assistance to her out of concern for her safety, and may have learned that the very person who claimed that Mr. Jackson was a threat for visiting retail

---

[6]   Defendant also makes repeated reference to the fairly recent Virginia Tech massacre – which in fact was earlier in time then when the complaint of discrimination which Mr. Jackson made was investigated and closed out: the week before the safety issue was raised by Ms. Vazquez – as if the illegal and malicious action by someone with a gun in that instance puts into question the legal interest and activity, and motives, of Mr. Jackson concerning guns. It should not, no more than the religious faith and malicious action of one person of a certain religion should call into question the law abiding character of another person with that same faith. In any event, the fact of the Virginia Tech massacre does not render Defendant's faulty investigation, and the question of its good faith, immune from scrutiny.

gun sites had an interest herself in purchasing a hand gun or something similar to that for her own safety and had turned in fact to Mr. Jackson for assistance in that regard.

Had they taken a real interest in determining whether Mr. Jackson had in fact intentionally violated the internet policy they may have learned of the prevalence of surfing otherwise "blocked" sites by employees when the filter was down, and with the knowledge and apparent consent of management. It is apparent, or at least reasonable to infer, from their failure to question or even inquire as to the identity of Ms. Vazquez, or talk to any other employees in the department, that they had no such interest.

A reasonable fact finder could easily come to an inference that the allegations of Mr. Jackson's being a safety threat, in light of all of the circumstances noted with citations to the record earlier in this brief, advanced by the Defendant are unworthy of credence, and that there is indicia in the record of a lack of good faith on the part of the Defendant that calls its action into question – and which warrants submission of the question of Defendant's actual intent to the jury. *See Kowalski v. L & F Products*, 82 F. 3d 1283 (3rd Cir. 1996)(material fact question as to employer's good faith in relying upon results of an investigation preclude summary judgment).

C.    **Plaintiff's Has Set Forth a Prima Facie Case for Retaliation and His Evidence of Pretext Requires Submission of Those Claims to the Jury**

In order to succeed of his retaliation claims under the ADA, and FMLA,[7] and PHRA, Plaintiff must show that he (1) engaged in protected activity; (2) that adverse

---

[7]   As with his ADA and PHRA claims, Plaintiff can succeed on his FMLA claim if he shows retaliation for his having opposed practices that violate the statute. *See Mahoney v. Ernst & Young LLP*, 487 F. Supp.2d 780, 808 (M.D. Tenn. 2006); *see also* 29 U.S.C. §2615 (a) (2). As Ms. Creedon noted, Plaintiff's internal complaint filed with HR included his claim that "he thought that he was being mistreated based on him going out on leave." Creedon Deposition, Exhibit 2, page 14.

action was taken against him; and (3) a causal link exits between his protected activity and PLANCO's actions. *Kauffman v. GMAC Mortgage*, 229 Fed. Appx. 164, 169 (3rd Cir. 2007).

There is no dispute that Plaintiff's termination constitutes adverse action satisfying the second prong. Plaintiff's internal complaint was protected activity, satisfying the first prong. The only dispute is as to whether Plaintiff can establish a causal link between his protected activity and his termination.

In the case of *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F. 3d 217 (3rd Cir. 2007), the court said as follows regarding the causation prong:

> We consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir.2000). **Where the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment**. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989) (reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). Where the temporal proximity is not "unusually suggestive," we ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." Farrell, 206 F.3d at 280 (internal citation and quotation marks omitted). Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating**\*233** the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. Id. at 279-81. See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ( "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

*LeBoon*, 503 F.3d at 232-33. Evidence of pretext, especially with a somewhat close temporal proximity, are sufficient facts from which a factfinder could find causation.

*Kellerman v. UPMC St. Magaret*, 2009 WL 723256 at * 2 ( 3rd Cir. March 19, 2009);

*Freeman v. Chertoff*, 604 F.Supp.2d 726, 738 n.21 ("the evidence of pretext . . . along with close temporal proximity . . . are sufficient facts from which a reasonable factfinder could find causation"); *Mascioli v. Arby's Restaurant Group, Inc.*, 2009 WL 703397 at *14 ("timing combined with evidence of inconsistent reasons given by an employer for an employee's termination was held to satisfy the causation prong of the prima facie case")(citations omitted).

In this case, the timely is "unusually suggestive," and Plaintiff may establish a *prima facie* case of retaliation by the timing alone. As noted above, Plaintiff filed his internal complaint of discrimination approximately a month his termination. Mr. Goumas completed his investigation and closed out that complaint, reporting his findings to Plaintiff, on April 30, 2007, a few days before Plaintiff was suspended, May 2, 2007. More significantly, Mr. Goumas questioned the very person who reported Plaintiff as a safety concern, Ms. Vasquez, on April 24, 2007, about 1 week before she made the report, the same day Plaintiff was supended, May 2, 2007.

Aside from temporal proximity and the pretextual nature of Defendant's reason for terminating Plaintiff (discussed above), other facts support an inference of causation. The only people to opine that Plaintiff was some kind of safety concern were the very managers whose conduct he was challenging in his complaint, Mr. Olshevski and Ms. Vasquez, the very people who would be motivated to retaliate against Plaintiff. They knew very well about Plaintiff's interest in guns,[8] and at least it is established in the

---

[8] Mr. Olshevski, at his deposition, stated that he was "aware of that now," i.e. Mr. Jackson's interest in guns, and that he didn't "know if [he] was aware of it at that time." Olshevski Deposition, Exhibit 5, pages 90-1, 93. Ms. Davis contemporaneous notes indicate that Mr. Olshevski told her Mr. Jackson was "is a gun enthusiast." Davis Deposition, Exhibit 3, pages 81-2 and P-29.

record that Ms. Vasquez was well aware of Plaintiff's habit of surfing the internet on occasion in pursuit of his gun interests long before she reported his conduct. A jury could certainly make the reasonable inference from these facts that there was a causal link between Mr. Jackson's discrimination complaint and the suddenly awakened sense of being in danger from him, in close proximity to the complaint and the investigation, exhibited by both Ms. Vazquez and Mr. Olshevski.

As noted, the same indicia of pretext and a lack of good faith in the investigation that apply to an analysis of Plaintiff's ADA and PHRA disability discrimination claims apply here. For the reasons expressed in that section of the brief and the reasons expressed here, it is respectfully requested that summary judgment be denied, and Plaintiff be permitted to present his claims to a jury.

**III.    CONCLUSION**

For all of the reasons expressed above, it is requested that Defendant's motion be denied.

Respectfully submitted,

/s/ Mark S. Scheffer

_____

Mark S. Scheffer
Attorney for Plaintiff