# Exhibit 1

## Page 29

(1) reported Mr. Jackson's complaint to you, were there
(2) any other – well, before I get to that, would you
(3) describe Ms. Creedon as an HR generalist?
(4)     **A.** That is her function. She may have a
(5) different title, more a broader title and more
(6) responsibilities than just an HR generalist, but
(7) yes.
(8)     **Q.** Were there any other HR generalists at
(9) PLANCO when Ms. Creedon informed you of
(10) Mr. Jackson's complaint?
(11)     **A.** There were other HR personnel. Whether they
(12) were actually HR generalists I do not know.
(13)     **Q.** Had you met any of the HR personnel
(14) there prior to that time?
(15)     **A.** No.
(16)     **Q.** On that instance where you made your
(17) visits to the facility regarding that misconduct
(18) claim by the official, did you meet anybody from HR
(19) on-site at that time?
(20)     **A.** I had dealings with Mary Creedon on that
(21) visit. Whether or not I met anyone else, to the
(22) best of my recollection, no. I may have – there
(23) may have been somebody there, but I don't recall who
(24) it was.

## Page 30

(1)     **Q.** What do you recall Ms. Creedon telling
(2) you when she informed you of Mr. Jackson's
(3) complaint?
(4)     **A.** To the best of my recollection, I recall her
(5) telling me that Mr. Jackson had returned – had been
(6) out of work for some period of time with some type
(7) of medical condition, I believe it was related to a
(8) heart condition or potentially a stroke, and that he
(9) returned, he had returned to work and had not been
(10) performing at an adequate level and was being
(11) performance managed, and that he felt that this
(12) performance management was the result of him – or
(13) that he was being – that this was basically him
(14) being harassed based on his medical condition.
(15)     **Q.** What did you do after Ms. Creedon
(16) informed you of Mr. Jackson's complaint?
(17)     **A.** Mary and I tried to coordinate an
(18) opportunity for me to speak with Mr. Jackson. We
(19) had tentatively scheduled the date, I believe it was
(20) the next day, but then there was, I think, a
(21) conflict in Mary's schedule. So we had to
(22) reschedule, and we rescheduled to a day a few days
(23) later, and I believe Mr. Jackson wasn't in the
(24) office that day; he ended up being out.

## Page 31

(1) And then we ultimately, Mary and
(2) I had a conference call together with Mr. Jackson.
(3)     **MR. SCHEFFER:** Let me show you a
(4) document we will have marked as P-1 right
(5) now.
(6)     (Whereupon P-1 was marked for
(7) identification.)
(8) **BY MR. SCHEFFER:**
(9)     **Q.** Mr. Goumas, you are being shown a
(10) document which has been marked as P-1; do you
(11) recognize this document?
(12)     **A.** Yes, I do.
(13)     **Q.** Can you identify it for the record?
(14)     **A.** This is the document that we had started
(15) using at or around that time, where we would just
(16) try to record the different investigative activities
(17) that we took associated with an investigation.
(18) Primarily things that were recorded in here were
(19) sort of contacts, interviews with different people
(20) that are part of the investigation.
(21)     **Q.** And had you interviewed anybody
(22) pursuant to your investigation of Mr. Jackson's
(23) complaint that would be reflected on P-1?
(24)     **A.** Yes.

## Page 32

(1)     **Q.** You also took notes of your
(2) investigation of Mr. Jackson's complaint, correct?
(3)     **A.** Yes.
(4)     **Q.** All right. Other than taking notes
(5) and speaking with the witnesses, did you generate
(6) any other documentation, a memo, you know, any other
(7) type of documentation?
(8)     **A.** To the best of my recollection, no.
(9)     **Q.** Did Hartford have any type of formal
(10) procedure regarding what types of documentation you
(11) had to put together when a complaint of
(12) discrimination was made and you were investigating
(13) it?
(14)     **A.** No.
(15)     **Q.** Does Hartford, or at the time, I'm
(16) sorry, did Hartford have a policy or some kind of
(17) directive or policy indicating what procedure you
(18) should use in investigating this type of complaint?
(19)     **A.** No.
(20)     **Q.** What type of guidance, if any, did you
(21) have in terms of how you should do this
(22) investigation provided by Hartford?
(23)     **A.** The guidance I would have had would
(24) been my own.

Page 37

(1) you clarify that?
(2) **Q.** Did she, for example, do you know if
(3) she was referred to you, or did she just pick up a
(4) phone and call you directly being aware that you're
(5) the person to call; do you know?
(6) **A.** She may have been referred to me.
(7) **Q.** Okay. Going back to P-1, looking at
(8) your log, that indicates you had a phone conference
(9) with Mr. Jackson on April 3rd, correct?
(10) **A.** It does.
(11) **Q.** Okay. Was anybody else present? Or
(12) not present. Was anybody else – well, let's start
(13) that way. Was anyone, when you talked to
(14) Mr. Jackson, was anybody else in your office with
(15) you?
(16) **A.** There was no one else in my office, no.
(17) **Q.** Okay. Was there anybody else on the
(18) line?
(19) **A.** Yes.
(20) **Q.** All right. Who was that?
(21) **A.** Mary Creedon.
(22) **Q.** Anybody else?
(23) **A.** Not to my knowledge. Other than
(24) Mr. Jackson.

Page 38

(1) **Q.** Okay. Your log indicates that you
(2) left a message for Steve O. Is that Steve
(3) Olshevski?
(4) **A.** It is.
(5) **Q.** All right. On April 12th.
(6) And you have an entry for start
(7) time, is that what, 5:30, can you make that out?
(8) 5:38.
(9) **A.** 5:36, I believe.
(10) **Q.** 5:36. Is that in the morning?
(11) **A.** No.
(12) **Q.** Okay. All right. So that indicates
(13) you called Steve about 5:36 on April 12th?
(14) **A.** That's what the document leads me to
(15) believe, yes.
(16) **Q.** Okay. Why did you put a time entry in
(17) on that item and not on the others on the list?
(18) **A.** No particular reason.
(19) **Q.** When you called Steve and left a
(20) message for him, I assume you got what, a voice
(21) mail?
(22) **A.** That's what this entry leads me to believe.
(23) Do I have a specific recollection of leaving the
(24) voice mail? No.

Page 39

(1) **Q.** All right. And do you remember what
(2) you – well, when you did talk to Mr. Olshevski, and
(3) I think this indicates you had a phone conversation
(4) with him on April 24th?
(5) **A.** That's what this document leads me to
(6) believe, yes.
(7) **Q.** Okay. Do you have any reason to doubt
(8) that?
(9) **A.** No.
(10) **Q.** All right. What did you tell him when
(11) you called him and actually spoke with him? What's
(12) the first thing you told him as to the purpose of
(13) your call and why you are calling?
(14) **A.** To my knowledge, at that point in time
(15) Mr. Olshevski would have been aware that Tony had
(16) raised this concern already, and I believe he was
(17) aware because Mary Creedon made both he and Christie
(18) aware.
(19) The typical procedure, what I
(20) would have told Mr. Olshevski is, I would have told
(21) him sort of who I am, what I do; that my role is to
(22) investigate internal complaints of discrimination or
(23) harassment or other violations of Hartford's HR
(24) policies.

Page 40

(1) I would have just reminded him
(2) that, you know, that as a Hartford employee, that,
(3) you know, he's governed by the code of conduct, and
(4) that he needs to just, you know, be sure that he is,
(5) you know, honest with me, and I probably would have
(6) asked him to keep it confidential.
(7) **Q.** You said that you believe that
(8) Ms. Creedon made him aware of Mr. Jackson's
(9) complaint?
(10) **A.** Yes.
(11) **Q.** All right. What do you base that on?
(12) **A.** I recall, you know, either a phone – either
(13) a phone discussion or e-mail exchange with Mary
(14) where she was trying to help me coordinate that
(15) discussion with Steve, with Mr. Olshevski, and I
(16) think I inquired of her that he and Christie were
(17) aware of the complaints so they would know why I was
(18) calling.
(19) **Q.** Okay. And I take it Ms. Creedon told
(20) you that they were aware of the complaint?
(21) **A.** When I spoke with him it was my
(22) understanding that he was aware of it, yes.
(23) **Q.** What happened to make you have that
(24) understanding during the conversation?

Page 49
(1) sick days, here and there."
(2)  Q.  Can you read what it says underneath
(3) that, after the next dash?
(4)  A.  It says, "SO," standing for Steve Olshevski,
(5) "has been following precedent re, regarding bonuses,
(6) annual bonuses or annual based on individual and
(7) company performance, quarterly based on direction of
(8) manager."
(9)  Q.  What is, since Mr. Olshevski made
(10) reference to following procedure regarding bonuses,
(11) what is the procedure regarding bonuses?
(12)  A.  I'm not totally, I'm not totally sure.
(13)  Q.  Is that something PLANCO, PLANCO's
(14) internal procedure?
(15)  A.  It is PLANCO's internal procedure, unique to
(16) PLANCO.
(17)  Q.  Did you ever make an attempt to
(18) understand what that procedure was at PLANCO?
(19)  A.  No.
(20)  Q.  Do you have an understanding as to why
(21) Mr. Olshevski was talking about bonuses there?
(22)  A.  I'm guessing that was probably in response
(23) to a question from me. I don't want to say I'm
(24) guessing. I think it's fair to say that was in

Page 50
(1) response to a question from me.
(2)  Q.  I apologize, I might have been lost in
(3) a train of thought. Where it says, "Dash SO has
(4) been following procedure," the line underneath that,
(5) what does that read again?
(6)  A.  "SO has been following precedent regarding
(7) bonuses, annual bonuses, based on individual and
(8) company performance, a quarter means quarterly based
(9) on –" oh, it's "discretion of manager."
(10)  Q.  Oh, okay. All right.
(11) The next page, I believe you
(12) said that that was part of your conversation, these
(13) notes reflect part of your conversation with
(14) Mr. Olshevski?
(15)  A.  Give me one moment.
(16)  Q.  Yes, sure, take a moment.
(17)  A.  I misspoke earlier.
(18)  Q.  Okay.
(19)  A.  These notes are not part of my conversation
(20) with Mr. Olshevski.
(21)  Q.  Okay.
(22)  A.  When I say these notes, I'm referring to
(23) PLA73.
(24)  Q.  Right. Got you. All right. Let's

Page 51
(1) take a – we will mark as – what are we up to?
(2) P-3.
(3)  (Whereupon P-3 was marked for
(4) identification.)
(5)  MR. SCHEFFER:  Why don't we take
(6) a short, couple-of-minute break and stop
(7) the video at this point.
(8)  THE VIDEOGRAPHER:  11:00
(9) o'clock, off the record.
(10)  (Discussion off the record)
(11)  THE VIDEOGRAPHER:  11:02, on the
(12) record.
(13) BY MR. SCHEFFER:
(14)  Q.  Mr. Goumas, the document you have been
(15) shown, P-3, can you identify that for the record?
(16)  A.  These are my notes from my conversation with
(17) Christie Vasquez on April 24th, '07.
(18)  Q.  If you look the fifth dash, I believe
(19) it reads, "Believes it was a three"?
(20)  A.  Mm-hmm.
(21)  Q.  Did you understand it? Can you tell
(22) me what that's in reference to?
(23)  A.  I believe that would have been in response
(24) to a question from me about what Tony's performance

Page 52
(1) rating was for the last performance cycle prior to
(2) the full year '06 cycle. And that would be
(3) Christie's response to me.
(4)  Q.  All right. And so I understand, so
(5) that at this time were you aware of Mr. Jackson, of
(6) having received a performance review for '06?
(7)  A.  Yes.
(8)  Q.  And is that the review he received in
(9) December of '06?
(10)  A.  It may have been November of '06.
(11)  Q.  Okay. So when Ms. Vasquez is
(12) referring to a review prior, she is talking to a
(13) review previous to that?
(14)  A.  Correct.
(15)  Q.  All right. Were you ever able to –
(16) well, pursuant to this investigation, did you review
(17) Mr. Jackson's personnel file?
(18)  A.  No.
(19)  Q.  Do you know if he had received a
(20) written evaluation prior to '06?
(21)  A.  Let me try to clarify that last response.
(22) Did I review documents that
(23) normally would be contained in a personnel file?
(24) Yes. Did I review his actual personnel file? No.

## Page 109

(1) concerns regarding his performance were well-founded
(2) and that I believe at that point in time.
(3) So I informed him that the
(4) investigation had been completed, and Mary Creedon,
(5) I believe, explained to him that, you know, while
(6) The Hartford had no obligation to do so, that we
(7) wanted to offer him the opportunity to take another
(8) role within PLANCO that would be, that he might be
(9) able to perform better, and I think she may have
(10) described it in general terms as being a data
(11) management role, and that, and that there would be
(12) some corresponding reduction in pay associated with
(13) that.
(14) Q. What did Mr. Jackson say? As to –
(15) well, first, let me break it down.
(16) What did Mr. Jackson say when
(17) you told him that there was a finding of no basis
(18) for the claim and that you felt his concerns, the
(19) concern, not his concern, their concerns regarding
(20) his performance were well-founded? What did
(21) Mr. Jackson say?
(22) A. Quite honestly, he said very little at all,
(23) to my recollection, unless my notes might mention
(24) something specifically. But my sitting here and

## Page 110

(1) just testifying from memory, he said, he said
(2) little.
(3) Q. Did you tell him who you had spoken to
(4) as part of your investigation, or did you just tell
(5) him the conclusion?
(6) A. I believe I may have told him, identified
(7) who I spoke with.
(8) Q. Do you have a distinct recollection of
(9) that sitting here today or it's your best
(10) recollection?
(11) A. It's my best recollection.
(12) Q. So you believe you would have told him
(13) that you spoke with Mr. Paladino?
(14) A. That I spoke with Mr. Paladino, that I spoke
(15) with Steve Olshevski and Christie Vazquez.
(16) Q. And do you recall him – you don't
(17) recall his response, if any, to your statement that
(18) you believed that the concerns regarding his
(19) performance were well-founded?
(20) A. Sitting here testifying from memory without
(21) the benefit of some document, no.
(22) Q. And the document would be your notes?
(23) A. Yes.
(24) Q. The decision to offer Mr. Jackson

## Page 111

(1) another position, a data management or data
(2) management position, role, did you discuss that with
(3) Mr. Olshevski?
(4) A. Referring to P-2, PLA73, I had asked
(5) Mr. Olshevski what position Tony could do, and my
(6) notes would reflect that Mr. Olshevski responded to
(7) the effect of operator, I believe.
(8) I don't believe there was any
(9) real in-depth discussion, and I believe
(10) Mr. Olshevski was just sort of responding to my
(11) question. I don't think he was suggesting
(12) affirmatively at that point in time that we move him
(13) to another position.
(14) Q. Why were you asking him that? I
(15) mean – well, go ahead, why were you asking him
(16) that, what could Tony do?
(17) MS. KRAUSE: Can I clarify
(18) something? The 73 is the same as the
(19) PL427 of Christie's notes.
(20) MR. SCHEFFER: Right.
(21) MS. KRAUSE: I just want to make
(22) that – he testified to that earlier, but
(23) I just wanted to clarify that.
(24) BY MR. SCHEFFER:

## Page 112

(1) Q. What Ms. Krause is referring to, I
(2) believe that's a page from your conversation with
(3) Ms. Vazquez, the one you are referring to.
(4) A. Okay. So I actually – so I need to correct
(5) my testimony.
(6) So the conversation about what
(7) Tony could do, the question was not directed toward
(8) Mr. Olshevski, but rather Ms. Vazquez.
(9) Q. So you had not discussed this other
(10) position with offering this other position to Tony
(11) with Mr. Olshevski before it was offered?
(12) A. I do not believe so.
(13) Q. Why not? If it was within his group,
(14) why wouldn't you discuss that with him?
(15) A. The issue was first raised about potentially
(16) offering Tony another role. It was initially raised
(17) by Mary Creedon.
(18) Q. How did she raise that?
(19) A. You know, she raised it within the context
(20) of, you know, people liked Tony. They did. As I
(21) indicated before, you know, he's funny. I mean, he
(22) was generally a nice guy.
(23) And I think that, you know, my
(24) sense, my understanding was, is that, you know, they

### Page 117

(1) of the conversation, you can answer
(2) generally speaking if you know who you
(3) heard from.
(4) **THE WITNESS:** To the best of my
(5) recollection, I received a phone call from
(6) one of Hartford's attorneys from the
(7) employment law group internally.
(8) **BY MR. SCHEFFER:**
(9) Q. Who?
(10) A. Ian Veitzer.
(11) Q. Tell me about Mr. Veitzer. What was
(12) his position with the company at that time?
(13) A. Mr. Veitzer is a, he is a counsel in the
(14) employment law group.
(15) Q. He is on the payroll of Hartford?
(16) A. Yes.
(17) Q. Its employee?
(18) A. Yes.
(19) Q. I understand Mr. Krause –
(20) A. Let me just –
(21) Q. Yes.
(22) A. It was either a phone call or an in-person
(23) conversation. I can't recall.
(24) **MR. SCHEFFER:** Is there any

### Page 118

(1) objection, Ms. Krause, as to the contents
(2) of the communication between Mr. Veitzer
(3) and Mr. Goumas?
(4) **MS. KRAUSE:** Absolutely.
(5) **MR. SCHEFFER:** On the basis of?
(6) **MS. KRAUSE:** Attorney-client
(7) privilege.
(8) **MR. SCHEFFER:** Instruction not
(9) to answer?
(10) **MS. KRAUSE:** You can't answer
(11) anything about the substance of the
(12) conversation.
(13) **BY MR. SCHEFFER:**
(14) Q. Was Mr. Veitzer asking for a legal
(15) opinion from you on the matter?
(16) **MS. KRAUSE:** Objection.
(17) Attorney-client privilege.
(18) **MR. SCHEFFER:** Are you
(19) instructing him not to answer that?
(20) **MS. KRAUSE:** Yes.
(21) **BY MR. SCHEFFER:**
(22) Q. What did you understand the purpose of
(23) Mr. Veitzer's phone call to you?
(24) If there is an objection, your

### Page 119

(1) counsel will make it.
(2) **MS. KRAUSE:** Objection,
(3) attorney-client privilege. Do not answer
(4) it.
(5) **MR. SCHEFFER:** The same
(6) objection as to whether Mr. Veitzer asked
(7) for a legal opinion?
(8) **MS. KRAUSE:** Yes.
(9) **BY MR. SCHEFFER:**
(10) Q. What did you do after Mr. Veitzer
(11) contacted you on this issue?
(12) A. To the best of my recollection, I believe I
(13) would have had a conversation with, knowing my
(14) practice, I would have had a conversation with Jaime
(15) Davis from PLANCO.
(16) Do I recall the specifics of
(17) that conversation? I don't, but the next thing that
(18) would have happened after that, that I can recall
(19) sitting here, would have been, I believe I was
(20) provided with certain documents from PLANCO
(21) reflecting Mr. Jackson's Internet history, and at
(22) some point shortly thereafter I would have had a, I
(23) had a phone conversation, a phone interview with
(24) Mr. Jackson, and I believe that Jaime Davis was also

### Page 120

(1) on that call.
(2) Q. So would you describe your role as
(3) doing the investigation on the issue of whether
(4) Mr. Jackson had violated the electronics data
(5) communication policy or the Internet policy?
(6) A. It's fair to say that I conducted an
(7) investigation to whether or not Mr. Jackson violated
(8) the Electronic Communications Policy, yes.
(9) Q. Okay. When you had this conversation
(10) with Jaime Davis, the initial conversation with her,
(11) did you make notes of that conversation?
(12) A. I don't recall any notes from that
(13) conversation. I mean, I don't have, as I sit here
(14) right now I don't have a specific recollection of
(15) having seen any particular notes. There might be,
(16) but I don't recall them as I sit here.
(17) Q. Did you maintain a separate folder on
(18) your investigation on this issue, the Internet,
(19) alleged Internet violation?
(20) A. Yes.
(21) Q. Do you still have that folder?
(22) A. Yes.
(23) Q. And I believe you did make notes of
(24) your conversation with Mr. Jackson?