## Page 129

(1) before? And other than Mr. Veitzer. You spoke to
(2) Mr. Veitzer, correct?
(3) A. As I indicated before, I did speak with
(4) Attorney Veitzer.
(5) Q. Right.
(6) A. I do not recall having any, taking part in
(7) any conversations with Kevin Conner directly.
(8) Q. So it might have been before you spoke
(9) with Mr. Jackson, the only person you spoke with was
(10) Ms. Davis about Mr. Jackson's Internet use and
(11) Mr. Veitzer?
(12) A. I can't, again, as I sit here right now, I
(13) don't recall having, without the benefit of, you
(14) know, any documents I don't recall having spoken
(15) with anybody else.
(16) Q. I think I asked you about notes
(17) regarding your conversation, initial conversation
(18) with Ms. Davis, and you are not sure if you –
(19) A. I'm not sure of any in particular.
(20) Q. Did you make notes of your
(21) conversation with Mr. Veitzer?
(22) A. I don't believe so.
(23) Q. Who is the employee – well, how was
(24) Mr., how was it discovered that Mr. Jackson was

## Page 130

(1) surfing gun sites?
(2) A. My understanding is, is that a co-worker of
(3) hers, excuse me, a co-worker of his was walking by
(4) and observed him using his computer to access gun
(5) websites.
(6) Q. Who is the employee?
(7) A. I don't know exactly who it was.
(8) Q. As the person who did the
(9) investigation, did you ever find out who that person
(10) was?
(11) A. I know that that person brought that concern
(12) forward to human resources at PLANCO, and then
(13) shortly after that I was provided with the Internet
(14) history reflecting that in fact that was the case.
(15) Q. Ms. Davis didn't tell you the name of
(16) that employee?
(17) A. I don't recall if she did or not.
(18) Q. Did you ask her?
(19) A. I don't recall.
(20) Q. Didn't you want to talk to that
(21) employee as a part of your investigation?
(22) A. I think that after I had the, after I had
(23) the Internet history from Mr. Jackson, I'm not sure
(24) what more that employee was going to add to the

## Page 131

(1) investigation.
(2) Q. So you had no interest in speaking to
(3) the employee?
(4) MS. KRAUSE: Objection to the
(5) form.
(6) A. I didn't feel that it was, I didn't feel
(7) that it was important, no.
(8) Q. So you had no interest in speaking to
(9) the employee?
(10) MS. KRAUSE: He's answered.
(11) Objection to form. He's answered the
(12) question.
(13) BY MR. SCHEFFER:
(14) Q. You had no interest in speaking to the
(15) employee, correct?
(16) A. I said that I didn't feel that it was
(17) important for me to speak with the employee.
(18) Q. And –
(19) A. Having received Mr. Jackson's Internet
(20) history.
(21) Q. And you wouldn't agree that that's the
(22) equivalent of no interest in speaking to the
(23) employee?
(24) MS. KRAUSE: Objection to the

## Page 132

(1) form. He's answered the question multiple
(2) times, Mark.
(3) BY MR. SCHEFFER:
(4) Q. She objected to the form. You can
(5) answer.
(6) A. Again, I didn't see it necessary to speak to
(7) the employee having received Mr. Jackson's Internet
(8) history.
(9) MR. SCHEFFER: You have to
(10) change.
(11) THE VIDEOGRAPHER: This
(12) concludes videotape number two. The time
(13) is 1:00 o'clock p.m. We are off the
(14) record.
(15) (Short recess taken.)
(16) THE VIDEOGRAPHER: This begins
(17) videotape number two, excuse me, number
(18) three. The time is 1:04 p.m.
(19) We are on the record.
(20) THE WITNESS: Can we – can I
(21) just confer with you for one second?
(22) MS. KRAUSE: Sure.
(23) THE VIDEOGRAPHER: 1:04 –
(24) MR. SCHEFFER: I just want to

## Page 133

(1) note for the record, you want to speak to
(2) counsel?
(3) **THE WITNESS:** Yes.
(4) **MR. SCHEFFER:** The witness is
(5) speaking to counsel.
(6) **THE VIDEOGRAPHER:** 1:04, off the
(7) record.
(8) (Discussion off the record)
(9) **THE VIDEOGRAPHER:** 1:05, on the
(10) record.
(11) **MR. SCHEFFER:** Mr. Goumas –
(12) **THE WITNESS:** If you let me just
(13) to clarify.
(14) I know before you asked me questions
(15) about what I did and conversations that I
(16) had with people relative to, after I found
(17) out about Mr. Jackson looking at these
(18) blocked sites, I know I mentioned the
(19) conversation with Jaime Davis, and I know
(20) we discussed the conversation, that I had
(21) a conversation with Attorney Veitzer, and
(22) there very well may have been other
(23) attorney-client privileged conversations
(24) with Attorney Veitzer as well, and I just

## Page 134

(1) wanted to clarify that for the record to
(2) make sure it was accurate. Okay?
(3) **BY MR. SCHEFFER:**
(4) Q. So you might have had more than one
(5) discussion with Mr. Veitzer?
(6) A. Yes.
(7) Q. Well, do you recall how many
(8) discussions with Mr. Veitzer? You couldn't tell us
(9) how many exactly?
(10) A. No, I couldn't.
(11) Q. I have a feeling we might be coming
(12) back to that some day, but we will leave that today.
(13) You said, one of the things you
(14) said was there was concern about possible violence
(15) by Mr. Jackson, and you identified Mr. Conner as
(16) having that concern.
(17) Who else at PLANCO, to your
(18) knowledge, had a concern about violence by Mr.,
(19) possible violence by Mr. Jackson?
(20) A. It was my understanding – I did not have a
(21) specific understanding as to, other than anybody
(22) individual, other than I know that Mr. Conner raised
(23) that, and I know that there was a, it was my
(24) understanding that it had been generally raised as

## Page 135

(1) well about folks at PLANCO.
(2) Q. And you understood it was generally
(3) raised by folks at PLANCO from your conversation
(4) with Mr. Davis?
(5) A. I believe that's accurate, yes.
(6) Q. Had Mr. Jackson, to your knowledge,
(7) had any past history of violent conduct at PLANCO?
(8) A. To my knowledge, no, he had not.
(9) Q. Are you aware Mr. Jackson of having
(10) any history of violent conduct outside of work?
(11) A. To my knowledge, no.
(12) Q. You are not aware of Mr. Jackson
(13) having any history of violent conduct anywhere,
(14) correct?
(15) A. No, I'm not. And to reiterate my point
(16) before, is that, my understanding was, is that, you
(17) know, that was just not a chance that management was
(18) willing to take, because the stakes and the risks
(19) were too high.
(20) Q. Did you ever check out any of those
(21) websites that Mr. Jackson viewed on the day he was
(22) at work that we're talking about now?
(23) I believe was mossberg.com. We
(24) can look at it, but do you recall viewing any of the

## Page 136

(1) sites that he told you about?
(2) A. I don't recall.
(3) Q. Isn't that a concern that you had?
(4) You are being told that there's a concern of
(5) possible violence by Mr. Jackson, and it's because
(6) of this web activity; didn't you want to make an
(7) effort to check out what the websites, what kind of
(8) content was on the websites?
(9) A. I think it was enough for me that they were
(10) gun websites. I don't think I needed to know
(11) anymore.
(12) And in addition, as I referenced
(13) before, I think I was already – you know, I had
(14) been made aware that Mr. Jackson had an extensive
(15) gun collection, including automatic weapons.
(16) Q. Who made you aware of that?
(17) A. To the best of my recollection, I believe
(18) that Ms. Davis made me aware of that.
(19) Q. In fact, you learned during your
(20) investigation that Mr. Jackson had – some other
(21) people at PLANCO had an interest in guns? You
(22) learned that during your investigation, correct?
(23) A. I believe so, yes.
(24) Q. In fact, Mr. Jackson told you that he

## Page 137

(1) actually had gone shooting with Christie Vazquez?
(2)  A.  I believe he did say that, yes.
(3)  Q.  Did you talk to Ms. Vazquez about her
(4) interest in guns as part of this investigation?
(5)  A.  No, I did not.
(6)  Q.  I believe Mr. Jackson told you that he
(7) had also taught John Evans and Zach in IT to shoot
(8) and had taken them out to a gun range.
(9)  A.  I believe he did say that, yes.
(10)  Q.  Did you talk to Mr. Evans or Mr. Zach
(11) or Zach about their interest in guns or their
(12) involvement with Mr. Jackson concerning guns?
(13)  A.  I did not.
(14)  Q.  Mr. Jackson told you, did he not, that
(15) he had some experience in security, in providing
(16) protection to people, did he not?
(17)  A.  I don't recall that specifically. I do
(18) recall him saying that he had a license to carry a
(19) concealed weapon I believe in the State of Florida
(20) with reciprocity in 28 other states or something to
(21) that effect.
(22)  Q.  Did you ask him why he had obtained
(23) that license?
(24)  A.  No.

## Page 138

(1)  Q.  So you don't recall Mr. Jackson
(2) telling you that he had a background in the security
(3) industry?
(4)  A.  I recall him saying something about, I
(5) recall, and I don't recall if this was something
(6) that he had mentioned to Jaime Davis previously or
(7) if this was something that he told me, again,
(8) without looking at my notes I don't have that
(9) recollection, said something about some security
(10) clearance.
(11)  Q.  He mentioned a security clearance that
(12) he had achieved through the government?
(13)  A.  A security clearance was what I recall.
(14)  Q.  Are you familiar with security
(15) clearances?
(16)  A.  Not specifically, no.
(17)  Q.  Do you have any knowledge of whether
(18) Mr. Jackson had any kind of criminal record?
(19)  A.  I'm not aware of whether he had any kind of
(20) criminal record.
(21)  Q.  Did you ask and talk to any of the
(22) people that Mr. Jackson worked with as to whether
(23) they felt threatened by Mr. Jackson or that they
(24) considered him a threat?

## Page 139

(1)  A.  I did not speak or I did not inquire of any
(2) of his co-workers with respect to those issues;
(3) however, as I've previously stated, it was my
(4) understanding that folks at PLANCO, to include Kevin
(5) Conner, were scared.
(6)  Q.  So your understanding that there was,
(7) in addition to Mr. Conner there were other
(8) individuals at PLANCO who had communicated some
(9) concern about safety regarding Mr. Jackson? Is that
(10) your understanding?
(11)  A.  That's my understanding.
(12)  Q.  And the person you believe or – and
(13) that understanding reached you through Ms. Davis,
(14) correct?
(15)  A.  To the best of my recollection, yes.
(16)  Q.  Looking at the log again, let's look
(17) at the log, P-8 – before we do that, I think you
(18) indicated Mr. Conner made the decision to terminate
(19) Mr. Jackson?
(20)  A.  I indicated that it was my understanding
(21) that Mr. Conner – I never spoke directly, to my
(22) recollection, with Mr. Conner, so I can't –
(23)  Q.  Okay. Were you involved with any
(24) discussions with Mr. Conner or anyone else as to

## Page 140

(1) what level of discipline would be imposed on
(2) Mr. Jackson as a result of this decision?
(3)  MS. KRAUSE:  Objection for
(4) attorney-client privileged conversations.
(5) He can testify to who he spoke with
(6) but nothing about the substance of those
(7) conversations. They're privileged.
(8)  BY MR. SCHEFFER:
(9)  Q.  Who did you speak with, who else did
(10) you speak with about the decision – not who else,
(11) but who did you speak with, have discussion with
(12) about whether Mr. Jackson would be terminated as a
(13) result of the alleged Internet violation?
(14)  MS. KRAUSE:  It's the same
(15) objection.
(16)  MR. SCHEFFER:  Who? I mean,
(17) again –
(18)  MS. KRAUSE:  You can answer, you
(19) can answer generally.
(20)  MR. SCHEFFER:  The question
(21) right now is who.
(22)  MS. KRAUSE:  Can you do the
(23) question again? It's a hard question.
(24)  MR. SCHEFFER:  Yes. The

Page 161
(1) essentially a filter in place which blocked sites
(2) to – block access to sites that were deemed
(3) prohibited.
(4)   Q.   And do you have knowledge of how that
(5) monitoring system worked, who did the monitoring,
(6) what other information was available to them? Could
(7) they always see what was going on at the location in
(8) terms of web surfing?
(9)   A.   I don't know.
(10)   Q.   As part of this investigation did you
(11) ask anybody or try to find that out, as to who was
(12) monitoring the situation at PLANCO on the day in
(13) question, for example?
(14)   A.   No. My understanding was, is that somebody
(15) had observed Mr. Jackson accessing gun sites. It
(16) was my understanding it wasn't something that was
(17) discovered through some monitoring software.
(18)   Q.   So you made no effort to discover who
(19) was monitoring?
(20)   A.   No, I didn't.
(21)   MR. SCHEFFER:   Let me show you a
(22) document which I will mark as P-12.
(23)   (Whereupon P-12 was marked for
(24) identification.)

Page 162
(1)   BY MR. SCHEFFER:
(2)   Q.   Mr. Goumas, you have been shown a
(3) document marked as P-12. Can you identify that for
(4) me?
(5)   A.   It's my understanding that this is the
(6) PLANCO Electronic Communications Policy.
(7)   Q.   And what's the – is there another
(8) document that this is part of, or is it part of a
(9) handbook, for example, or another larger policy?
(10)   A.   I don't know.
(11)   Q.   How did you get a copy of this?
(12)   A.   I believe this was provided to me by
(13) Jaime Davis.
(14)   Q.   Which of the – if you see the
(15) inappropriate, there's a definition of inappropriate
(16) web/e-mail content. There's dashes for different
(17) categories. Which of those do you believe
(18) Mr. Jackson violated?
(19)   A.   I believe he violated the last bullet down,
(20) "Visiting, downloading, or distributing
(21) inappropriate material."
(22)   Q.   Was he visiting pornography?
(23)   A.   It says "And/or pornography." Those are
(24) disjunctive.

Page 163
(1)   Q.   I understand that. My question right
(2) now to you is, listen to the question –
(3)   A.   And I'm trying to answer your question.
(4)   Q.   I asked you, I asked you, did
(5) Mr. Jackson view pornography?
(6)   A.   The answer is no.
(7)   Q.   Okay. It's a little different.
(8)   MS. KRAUSE:   Mark, don't get
(9) argumentative.
(10)   MR. SCHEFFER:   I'm not being
(11) argumentative. I'm not being
(12) argumentative. I mean, he wasn't
(13) answering the question.
(14)   BY MR. SCHEFFER:
(15)   Q.   So in your view Mr. Jackson viewed
(16) inappropriate material?
(17)   A.   Yes. And it's inappropriate material
(18) because it's blocked by The Hartford's filter, and
(19) Mr. Jackson knew it to be blocked. And further,
(20) it's highly inappropriate material and very
(21) concerning material because he's being performance
(22) managed, you know, realize that he may potentially
(23) lose his job, and he's looking at gun websites.
(24)   Q.   It's inappropriate – let me just try

Page 164
(1) to understand your response. It's inappropriate
(2) because it was a blocked site in the first place,
(3) correct?
(4)   A.   In the first instance, yes.
(5)   Q.   So any blocked sites would be
(6) inappropriate by that definition, correct?
(7)   A.   Yes.
(8)   Q.   And, secondly, you said it's
(9) inappropriate because of the content?
(10)   A.   It's inappropriate – I understand that you
(11) want to place it in a vacuum, but, again, I think it
(12) needs to be viewed in light of all the circumstances
(13) that are at play at the time.
(14) As I've explained before,
(15) Mr. Jackson is looking at gun websites during this
(16) period of time when he is being performance managed,
(17) doesn't agree with the performance management that's
(18) taking place by his supervisors; feels that it's
(19) unfair, is concerned about losing his job; we're in
(20) a climate that is 2 and a half weeks after the
(21) Virginia Tech massacre, that makes it even more
(22) inappropriate.
(23)   Q.   Well, the policy says inappropriate
(24) material, and I'm trying to understand, and you've

Page 165
(1) already explained the fact that it's a blocked site,
(2) which is inappropriate material; is there anything
(3) else about what Mr. Jackson visited that makes it
(4) inappropriate material?
(5) A. I mean, other than, you know, other than
(6) what I've already identified, along with the fact
(7) that Mr. Jackson essentially utilized his
(8) accessibility to the knowledge that the site –
(9) excuse me, that the Internet filter was down, based
(10) on his role in IT that was information that he had
(11) more readily than other employees, that's also
(12) something that factors in, but I don't have anything
(13) else to add.
(14) Q. That has nothing to do with the
(15) material. That has to do with the fact of his
(16) action, you'd agree?
(17) A. I could agree.
(18) Q. Mr. Jackson made reference to a, when
(19) you talked to him, I believe – well, let's take a
(20) look at that.
(21) I think that we were at your
(22) notes regarding talking to him about the suspension,
(23) et cetera, the investigation, P-9. There is a
(24) reference on page 183 towards the bottom.

Page 166
(1) A. I'm sorry, give me one second.
(2) Q. Yes.
(3) A. P-9?
(4) Q. Yes, P-9. There is a reference
(5) towards the bottom of the page –
(6) A. 183?
(7) Q. Yes, 183. I think it says "Dash,"k
(8) it's the last dash, I think "Strangely, 2 days ago
(9) they put out Internet protocol." Is that something
(10) Mr. Jackson told you?
(11) A. That's something he told me, yes.
(12) Q. Okay. "Alan Hoyt sent out an e-mail
(13) he got on his Blackberry regarding Internet access."
(14) A. That's what he told me, yes.
(15) Q. Did you have any knowledge, were you
(16) aware of there being a group of employees, not
(17) including Mr. Jackson, who had a hobby of going
(18) handgun shooting? I think they were all female
(19) employees, actually.
(20) A. This is not including Mr. Jackson?
(21) Q. Not including Mr. Jackson, correct.
(22) A. No.
(23) Q. Let me show you a document which we
(24) will now mark as P-13.

Page 167
(1) No, go back to P-10, Mr. Goumas,
(2) please.
(3) If you look at the last page,
(4) Mr. Goumas, of P-10, it says "Draft" at the top.
(5) A. Mm-hmm.
(6) Q. Do you see that? Can you identify
(7) this page for the record?
(8) When did you – I'm assuming
(9) that you prepared this before talking to
(10) Mr. Jackson. Is that true?
(11) A. Yes.
(12) Q. About a little past halfway down is a
(13) dash, and it says, can you read that,
(14) "Consistent –"
(15) A. "Consistent with our practice in other
(16) situations of knowing violation, the decision has
(17) been made to terminate your employment effective,"
(18) it's effective today.
(19) Q. And my question is, you say consistent
(20) with our past practice in other situations. What
(21) other situations are you referencing there?
(22) A. In past practices with knowing violations of
(23) the Electronic Communications Policy, it was my
(24) understanding that we had taken similar action.

Page 168
(1) Q. And how did – your understanding is
(2) based upon what?
(3) MS. KRAUSE: Did you testify
(4) past practice? Did he testify past
(5) practice?
(6) Can the record be read back to his
(7) first comment when he read it?
(8) MR. SCHEFFER: What?
(9) MS. KRAUSE: You asked him about
(10) past practice. I think he just said
(11) consistent with our practice in other. I
(12) don't think he read past practice.
(13) BY MR. SCHEFFER:
(14) Q. Why don't you read it for us again?
(15) A. It says, "Consistent with our practice in
(16) other situations of knowing violations."
(17) Q. That doesn't say "past" there? What
(18) does that say?
(19) A. I think that's a cross-out.
(20) Q. Were you starting to write "past"?
(21) A. I don't think so. It looks like a cross-out
(22) to me. It doesn't look like "past" to me.
(23) Q. All right. But nonetheless, you are
(24) referencing other situations of knowing violations,