Exhibit 2

## Page 13

(1) same or are they still different. Each policy I
(2) look it up separately and check. The trend is that
(3) we're starting to fall under the parent company, but
(4) not always.
(5) **Q.** All right. Tell me, have you, other
(6) than Mr. Jackson, and we will talk in some detail
(7) about Mr. Jackson, have you ever been involved or do
(8) you have any knowledge of any other employee at
(9) Planco making some type of claim that Mr. Olshevski
(10) harassed them or discriminated against them in some
(11) fashion?
(12) **A.** No.
(13) **Q.** How about any other employee making a
(14) claim that Christie Vazquez did that?
(15) **A.** No.
(16) **Q.** How about any employee making a claim
(17) that Mr. Hoyt did that?
(18) **A.** No.
(19) **Q.** How about any employee making a claim
(20) that Kevin Conner did that?
(21) **A.** No.
(22) **Q.** In terms of your interaction with
(23) Tony Jackson, I will ask you broadly, can you
(24) identify specifically certain issues which you

## Page 14

(1) addressed with Mr. Jackson?
(2) **A.** Sure.
(3) **Q.** We will do it by issue first, if we
(4) can.
(5) **A.** Well, Tony came to me with the issue of, he
(6) wasn't happy about how he was being – his
(7) performance was being managed.
(8) **Q.** Okay. That's one issue.
(9) **A.** And I don't remember if it was the first
(10) time we talked or the second or third. Probably the
(11) first or second, he, it's really part of the same
(12) issue, he said that he was being asked to perform at
(13) a standard that he wasn't happy with, and he said
(14) that he thought that he was being mistreated based
(15) on him going out on leave. And somewhere in there
(16) he said that Steve, he thought Steve Olshevski
(17) didn't like him.
(18) So it's all wrapped into how his
(19) performance was being managed originally.
(20) **Q.** And I take it those are the only two
(21) issues you addressed directly with Mr. Jackson?
(22) **A.** Yes.
(23) **Q.** Now, were you ever involved with
(24) either the investigations or any other – well, were

## Page 15

(1) you involved with any investigations of Mr. Jackson
(2) separate from those two issues you mentioned?
(3) **A.** No.
(4) **Q.** There is an issue which we can address
(5) in more detail later, but there was an investigation
(6) of Mr. Jackson's Internet use.
(7) **A.** Mm-hmm.
(8) **Q.** Did you have any involvement with
(9) that?
(10) **A.** I was on vacation when all that happened.
(11) **Q.** Okay.
(12) **A.** So Jaime reports to me; she called me in
(13) Ireland to tell me about it, but I wasn't involved.
(14) **Q.** What did Jaime tell you about that?
(15) **A.** That there was an investigation going on
(16) that Tony was accessing sites with regard to guns
(17) and that people were scared.
(18) **Q.** Did she tell you who was scared?
(19) **A.** I don't remember.
(20) **Q.** Did you speak to anyone else about
(21) that issue of Tony accessing the sites and people
(22) being scared?
(23) **A.** No. I was in a really remote part of
(24) Ireland; I was pretty unavailable. She was having a

## Page 16

(1) rough time. She was dealing with this issue and
(2) there was a snake loose in the building. She told
(3) me about that, which was bizarre, and I said, "I'm
(4) sorry I'm not there," and that was about it.
(5) **MR. SCHEFFER:** Off the record.
(6) (Discussion off the record)
(7) **BY MR. SCHEFFER:**
(8) **Q.** When you got back from Ireland, did
(9) you have any discussions with anybody about – well,
(10) when you got back from Ireland, had Tony been
(11) terminated?
(12) **A.** He had. It was all done. I don't know the
(13) dates, but it was over.
(14) **Q.** Did you talk –
(15) **A.** Although we still had police on-site. They
(16) were undercover, but everyone knew they were police,
(17) for I'd say about a month. So that was kind of the
(18) trail of it.
(19) **Q.** Did Jaime bring you up-to-date on
(20) Mr. Jackson's situation when you got back?
(21) **A.** Yes.
(22) **Q.** What did she say?
(23) **A.** High level. She said, "We fired him"; that
(24) it was tough on her; she definitely didn't enjoy it,

Page 17

(1) and that he had accessed these sites, and that we'd
(2) become aware of his gun ownership, which seemed to
(3) be extensive; I don't remember the details. That's
(4) about it.
(5)   Q.   Did she tell you anything about the
(6) types of sites he was visiting, other than being
(7) gun sites?
(8)   A.   Not that I know. No, I don't remember.
(9)   Q.   Other than talking to Jaime when you
(10) got back about that issue, Mr. Jackson's termination
(11) and his visiting websites, did you talk to anybody
(12) else about it?
(13)   A.   Kevin Conner, just about how long we should
(14) keep police around for. We used to talk every week
(15) and decide if we'd extend it another week. You
(16) know, close to the end of the week we'd decide, and
(17) that was all I remember.
(18)   Q.   Was there any contact from Mr. Jackson
(19) after – are you aware of any contact Mr. Jackson
(20) made with Planco after he was terminated?
(21)   A.   I think he contacted someone in IT, but I
(22) don't remember who and I don't remember why. It was
(23) something pretty basic, not anything that concerned
(24) me. I have a vague recollection.

Page 18

(1)   Q.   I think you said that Jaime said that
(2) people were scared of Mr. Jackson?
(3)   A.   Mm-hmm.
(4)   Q.   During your dealings with Mr. Jackson,
(5) was there ever an occasion where you were scared of
(6) him?
(7)   A.   No.
(8)   Q.   Did he ever exhibit any violent
(9) tendencies on the occasions you dealt with him?
(10)  A.   No.
(11)  Q.   Okay.
(12)  A.   There was one occasion when Greg Goumas and
(13) I offered him a more junior role with less comp that
(14) he was dramatically different to how he – his
(15) normal behavior.
(16) His normal behavior when I
(17) talked to him was very slow speech and calm and very
(18) exact, and when we offered him the more junior job
(19) at a lower comp, he was very angry. Offended was
(20) the – you know, very strong emotion of finding our
(21) offer highly offensive, and I think that's the last
(22) time I spoke to him before I went out on vacation.
(23)  Q.   Did he make any type of threats during
(24) that conversation?

Page 19

(1)   A.   No, but I knew how mad he was.
(2)   Q.   What did he say?
(3)   A.   I don't know if he used the word disgusted,
(4) but that's definitely the impression I got, that he
(5) was disgusted by the offer.
(6) Numerous times I offered for him
(7) to think about it, because he said no immediately,
(8) and I said you have – you know, think it over
(9) tonight. I don't know if I gave him a few days, but
(10) I definitely gave him a day or so to think it over,
(11) and he was offended that I offered him more time to
(12) think about it, and he left my office steamy.
(13) He didn't calm down while he was
(14) in the room with me.
(15)  Q.   Where was Mr. Goumas?
(16)  A.   On the phone.
(17)  Q.   Was anybody else present?
(18)  A.   I don't think so, no. It was just Greg on
(19) the phone with me in the office with Tony, in my
(20) office.
(21)  Q.   Did you talk to anybody about Tony
(22) being very offended and upset, angry?
(23)  A.   Probably.
(24)  Q.   Do you remember talking to anybody

Page 20

(1) about that?
(2)   A.   I don't know specifically about that, but
(3) people I would have talked to about the issue in
(4) general would have been Ian Veitzer for legal
(5) counsel; Greg, obviously, because he was
(6) investigating this; Jaime because I would have been
(7) handing it off to her, going on vacation, and Kevin
(8) because Kevin would have to approve the offer.
(9)   Q.   So you would have spoken to Kevin
(10) before the offer was made?
(11)  A.   I would have got his approval, and then I
(12) would have told him afterwards he turned it down.
(13)  Q.   But you don't recall telling Kevin
(14) that Tony was angry?
(15)  A.   I don't recall. I'm sure I did, but I don't
(16) recall.
(17)  Q.   Did you in any way document that
(18) meeting with Tony, a memo or anything?
(19)  A.   I don't know, because if Greg was on the
(20) line, Greg might have been the person documenting.
(21) Normally Greg and I would agree beforehand who is
(22) tracking, and I don't remember in that conversation
(23) who it was.
(24)  Q.   Typically you would expect a memo to

### Page 37

(1) of the week it was. I can check my calendar if you
(2) need it.
(3) Q. I hate to do this to you, but I'm not
(4) going to have a lot of questions.
(5) A. No, that's fine.
(6) Q. Can you read that for me?
(7) A. This whole thing?
(8) Q. Yes, the whole thing.
(9) A. Page 271?
(10) Q. Sure.
(11) A. So up top it says Greg G. and Jaime D. and
(12) myself and Tony Jackson on April 30th, and then
(13) Greg Goumas stated that he completed the
(14) investigation, that he spoke to Steve Olshevski,
(15) Christie Vazquez, and Eric Paladino, and that he
(16) cannot substantiate any evidence of disability
(17) discrimination. It appears the basis of the
(18) employer, meaning Hartford or Planco's performance
(19) evaluations are well supported. Mary has other
(20) options for you.
(21) And then I stated that, you
(22) know, given that the findings are concluded, I will
(23) be letting Steve and Christie know to continue to
(24) manage your performance to meet the expectations of

### Page 38

(1) the role. Another option is that you take a role in
(2) data management with a salary decrease.
(3) And I believe I told him the
(4) amount. It doesn't look like I noted it, but I'm
(5) pretty sure I had an amount to offer him.
(6) Q. Can you remember what that position
(7) was? It says role in data management.
(8) A. Data management is a department, a small
(9) department within IT, and they do data entry. They
(10) spend their time tracking and logging sales
(11) information into our systems which we use to
(12) determine how to pay our salespeople.
(13) So it's basically a data entry
(14) job, but some data manipulation, but mainly data
(15) entry.
(16) Q. And what type of reduction, I think
(17) Mr. Jackson's salary is in the range of 60,000, what
(18) type of reduction would this position have been?
(19) A. I don't remember. I hope Greg has that.
(20) Q. Do you remember if it was less than
(21) half? Less than 30?
(22) A. I doubt it's less than 30. I would think it
(23) would be more than that.
(24) Q. What does the last line say?

### Page 39

(1) A. "Tony Jackson said not interested. Thank
(2) you, but no."
(3) Q. And that's a quote from Tony, "Thank
(4) you, but no"?
(5) A. Mm-hmm.
(6) Q. Yes?
(7) A. Yes.
(8) Q. Had you been involved in any other
(9) situations – well, I shouldn't say other because
(10) you weren't involved in Mr. Jackson's directly. But
(11) were you involved in the other situations where
(12) there was an investigation of an employee Internet
(13) use at work?
(14) A. Yes.
(15) Q. How many other situations like that
(16) would you have been involved in?
(17) I don't want to ask you a
(18) number. Can you name the other situations, the
(19) other employees?
(20) A. No.
(21) Q. I will ask you a number then. Would
(22) it have been more than five?
(23) A. So Internet usage?
(24) Q. Yes, about whether they were too much

### Page 40

(1) time on a site or visiting sites they shouldn't have
(2) visited.
(3) A. Probably around five.
(4) Q. Have you ever done that, have you ever
(5) done that with an employee in the technical
(6) operations department?
(7) A. Not that I remember, but I don't remember
(8) them all.
(9) Q. Has any other employee been, any of
(10) these employees that you have been involved with
(11) been fired as a result of their Internet usage?
(12) A. Yes.
(13) Q. Do you remember the names of the
(14) people who were fired?
(15) A. There is only one that I remember that was
(16) fired, and I don't remember his name. He worked on
(17) the sales desk on the second floor, and he was
(18) involved in gambling. He was not just gambling, but
(19) actually administrating the gambling, and I don't
(20) remember his name. He was terminated.
(21) Q. Do you remember who his supervisor
(22) was?
(23) A. His ultimate supervisor was Cinda
(24) Hottenstean, H-O-T-T-E-N-S-T-E-A-N.