IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TONY JACKSON                   :        CIVIL ACTION
                               :
        v.                     :
                               :
PLANCO                         :        NO. 08-5144


MEMORANDUM

Dalzell, J.                              September 29, 2009

        Plaintiff Tony Jackson sues his former employer, PLANCO

Financial Services, L.L.C. ("PLANCO"), for discrimination and

retaliation pursuant to the Americans with Disabilities Act

("ADA"), the Family Medical Leave Act ("FMLA"), and the

Pennsylvania Human Relations Act ("PHRA"). Jackson claims that

PLANCO discriminated against him based on his disability when it

terminated his employment on May 8, 2007. He also contends that

PLANCO retaliated against him for complaining about the alleged

discrimination and a supervisor's negative treatment of him after

he took medical leave.

        PLANCO moves for summary judgment on all of Jackson's

claims. For the reasons we discuss below, we will grant that

motion and dismiss this action.

I.  <u>Factual Background</u>

As is often the case with employment discrimination cases, we will begin with a lengthy canvass of the record.

### A.  <u>Jackson's Employment at PLANCO and Employees' Discussions About and Use of Guns</u>

PLANCO is a subsidiary of The Hartford, which is an insurance corporation. Declaration of Mary Creedon, Def. Ex. A, at 1. Plaintiff Tony Jackson began to work at PLANCO as a temporary employee in September of 2004. Jackson Dep. At 35. In December of that year, PLANCO hired him as a full-time employee to be its Lotus Notes Administrator. <u>Id.</u> at 36. Lotus Notes is a collection of software programs used for several functions, including email, and at PLANCO Jackson was responsible for the email, storage, and server functions. <u>Id.</u> at 36-37.

When Jackson began work at PLANCO, Jay Karabin was his immediate supervisor and Eric Paladino was the manager above Karabin. <u>Id.</u> at 85. Karabin left PLANCO in the spring of 2005, and Christie Vazquez in July of that year replaced him as the Platform Team Lead and Jackson's supervisor. <u>Id.</u> at 88; Vazquez Decl. at 1. While Paladino was at PLANCO, he wrote Jackson's performance reviews, but Vazquez took on this task when Steve Olshevski -- the target of Jackson's discrimination complaint --

-2-

replaced Paladino around July of 2006. Vazquez continued as Jackson's immediate supervisor through his termination in May of 2007. Vazquez Dep. at 11; Vazquez Decl. at 1; Goumas Dep. at 79.

Vazquez considered Jackson to be "a friend" while he worked at PLANCO, and they socialized on a few occasions.[1] Vazquez Dep. at 13-14. See also Jackson Dep. at 90-91. Jackson gave Vazquez a tour of The Inquirer and went with her to look at an apartment because he was concerned about her safety. Vazquez Dep. at 15.  Jackson also took Vazquez to a shooting range, and he taught her how to use a gun.[2] Id. In fact, plaintiff collects guns and knives, as well as "Russian fairytale boxes." Jackson Dep. at 251. He owns more than twenty guns, including revolvers, semiautomatic handguns (an "Oozie [sic]"), rifles, and shotguns. Id. at 261-62. According to Jackson, he is licensed to carry a concealed weapon in twenty-eight states. Id.

Vazquez described herself as "very antigun"[3] and said

---

[1] Jackson confirms that they spent time together outside of work fewer than five times. Jackson Dep. at 92.

[2] He also took other PLANCO colleagues shooting. Jackson Dep. at 260.

[3] Matt Szoke, who also worked in the department, claims that he heard Vazquez discuss with Jackson the possibility of purchasing a handgun for her self-protection. Szoke Dep. at 54.

that Jackson would often talk about guns and debate gun control
issues at work. Vazquez Dep. at 17-18. Vazquez characterized
Jackson as a "very rigorously progun, pro second amendment, NRA
type." Id. at 19, 24.  Several other people, including Paladino,
joined in these debates, but Olshevski did not. Szoke Dep. at 51-
52; Vazquez Dep. at 20.

        Several other PLANCO employees and executives were
involved in the events that led to this litigation. Mary Creedon
is an Assistant Vice-President for Human Resources at The
Hartford. Creedon Dep. at 9-10. Jamie Davis was a Human Resources
Generalist for PLANCO. Davis Dep. at 7. Alan Hoyt was an
executive in PLANCO's technology department.[4] At the time of the
events at issue in this case, Gregg Goumas was the Practice
Leader of Employee Relations Investigations for Hartford, and he
conducted internal investigations of Jackson's discrimination
complaint and the events that led to his termination. Goumas Dep.
at 11, 20. Kevin Connor was an Executive Vice-President for
PLANCO and made the decision to terminate Jackson's employment,

---

        [4] According to defendant's brief, he was the Chief
Technology Officer and Vice-President of Information Technology.
See Def. Brief at 10.

but he never personally had contact with Jackson and would not recognize him. Connor Dep. at 10.

### B.  Jackson's Illnesses and Medical Leave

Jackson has atrial fibrillation, a heart condition that causes an irregular heartbeat. Jackson Dep. at 53. He had a heart attack and stroke in January of 2006, and his heart condition precludes him from "do[ing] things for a long period of time, like running for a long period of time." Id. at 53-54. Jackson was on medical leave from January to April in 2006 due to these heart problems. Id. at 105. During the last part of April he worked part-time from home, with permission from his doctor and PLANCO. Id.

In addition to this lengthy leave following his heart attack and stroke, Jackson missed work for a week in September of 2006 due to gout. Id. at 54-55, 107. During his most difficult experience with that condition, Jackson could not walk, but he was able to walk with a cane by the time he returned to work and without the cane by November of that year. Id. at 63, 335. The pain he experienced from gout returned for a day or so later in 2006, and Jackson described any problems that he had with gout in

2007 as "very minor." <u>Id.</u> at 62-63. The record does not show that Jackson has had any problems with gout since 2007.[5]

### C.  Olshevski's Alleged Poor Treatment of Jackson After His Sick Leave

Jackson is "satisfied" with the way PLANCO addressed both of these periods of medical or sick leave. <u>Id.</u> at 107. He does not believe that anyone at PLANCO retaliated against him for the longer medical leave at the beginning of 2006. <u>Id.</u> at 111. Jackson's retaliation claim is based partially on Olshevski's "demeanor" toward him after he returned from his one-week leave in September of 2006. <u>Id.</u> at 109. According to Jackson, Olshevski behaved in a manner that suggested that Jackson "had in some way done something incorrect or wrong," but Olshevski never mentioned the fact that Jackson had taken this short period of leave, nor did he ever say that it was wrong to do so. <u>Id.</u> at 109-110. When Jackson was asked how he knew that Olshevski's behavior was due to his leave rather than his work quality, he explained that

---

[5] Plaintiff also has sleep apnea, which was diagnosed in 2005 or 2006. <u>Id.</u> at 64. According to Jackson, he is able to manage this problem. <u>Id.</u>

-6-

Vazquez reviewed his work, so he did not "believe" that his work quality was the source of Olshevski's concerns.[6] Id. at 111.

Vazquez's treatment of Jackson did not change after he returned from his September 2006 leave. Id. Plaintiff claims that only Olshevski retaliated against him, for example by giving Jackson unreasonable deadlines. When Jackson had to leave work early for medical appointments, Olshevski would often give him assignments just before he left. Id. at 162. Jackson said "there was no axe over [his] head, but [Olshevski] wanted them finished."[7] Id. Jackson also explained that he got unfavorable reviews after he returned from his leave and believed this was retaliatory or discriminatory. But Jackson said that his assertions regarding Olshevski's treatment of him were based on "only [his] perception of [Olshevski's] attitude." Id. at 111. Jackson also believed that Olshevski thought he could not improve, but that was also based solely on his "perception" of

_____

[6] As described below, Olshevski was intimately involved in PLANCO's performance management of Jackson and certainly knew about the perceived low quality of Jackson's work.

[7] Olshevski has no recollection of this. Olshevski Dep. at 77. But viewing the facts in the light most favorable to Jackson, we assume that Olshevski did ask Jackson to complete tasks just before he left for medical appointments and tell Jackson that "he wanted them finished."

Olshevski's treatment. Id. at 118. Indeed, in Olshevski's annual review of Jackson's performance, he specifically stated that he thought Jackson could improve. Performance Review of Tony Jackson, Def. Ex. G ("Performance Review") at 3.

### D.   PLANCO Addresses Jackson's Purported Performance Issues

A few months after Vazquez began working at PLANCO -- but before Jackson went on his medical leave in early 2006 -- she began to feel that Jackson was not properly performing his job. Vazquez Dep. at 37-38. She talked to Jackson about some of these issues, but she never mentioned them to Paladino. Id. When Olshevski began to work at PLANCO, Hoyt -- Olshevski's boss -- told him that he wanted to improve the organization and performance of Olshevski's department. Olshevski Dep. at 13. As part of that effort, Olshevski gave Vazquez more authority in managing her group. Id. at 26. He asked her about her impression of the people on her team, and she told him that Jackson "wasn't performing essential pieces of the job" and "that a lot of the issues we [were] experiencing around the [Lotus] Notes environment were because he was not performing his job properly." Vazquez Dep. at 37. Olshevski recalls that Vazquez "had little

confidence in [Jackson's] technical abilities." Olshevski Dep. at 28.

On October 9, 2006, after Jackson returned from his one-week sick leave, he met with Olshevski and Vazquez to discuss his performance and Olshevski's plan to "raise the bar" with his work. Jackson Dep. at 119; Memo from Steve Olshevski to Tony Jackson Regarding Performance Meeting on October 9, 2006, October 20, 2006, Def. Ex. E.[8] Jackson described this meeting as both disciplinary and setting expectations for the future. Jackson Dep. at 119. They discussed, <u>inter alia</u>, Jackson's "ability to remain actively working" and "not falling asleep." <u>Id.</u> Although Jackson disagreed with some of the performance issues that Olshevski and Vazquez brought up at the October 9 meeting, he admitted that there were some problems. For example, he was attempting to address the company's issues with its firewall, which prevented email from being sent or received, and it was "taking a while to correct" the problems. <u>Id.</u> at 121-22. He explained that these issues were multifaceted and difficult to

_____

[8] Jackson affirmed that these notes accurately reflect the discussion at that meeting. Jackson Dep. at 119.
As a side note, Mary Creedon reviewed some of the documents that Olshevski and Vazquez gave to Jackson throughout this period of performance management. Olshevski Dep. at 49-50.

fix. Id. at 125. Jackson also understood that Olshevski believed that he needed to improve his expertise in Lotus Notes, though Jackson believed his skills were already at an appropriate level. Id. at 122, 124.

On November 16, 2006,[9] Jackson received his annual review, which reflected his supervisors' opinions that much of his work did not meet their expectations. See Performance Review. The review, which listed Olshevski as Jackson's manager, stated that Jackson rebooted the servers during business hours, had incorrect security issues, and improperly planned software upgrades. Id. at 1-2. But it also reflected that he was willing to work additional hours and was "good at finding the cause of an issue and applying a short term fix." Id. at 2. The Performance Summary states that although Jackson's performance "did not meet expectations," he "recently attempted to make improvements" and that "Tony can succeed in making these needed improvements." Id. at 3.

Vazquez and Olshevski met with Jackson to give him this review, and Olshevski believes that Jackson "essentially agreed

---

[9] The review is dated November 6, 2006, but it appears that Jackson met with his supervisors to discuss it on November 16, 2006. See Performance Review at 1, 6.

-10-

that he needed to improve." Olshevski Dep. at 51. But Jackson protested that his "performance was better than what they had listed, and that certain things . . . were just incorrect." Jackson Dep. at 131.  He said that the review "anger[ed]" him and he believed that management "swayed" his review to make him resign or "cause problems" for him. Id. at 136-37. Jackson was also upset that he did not receive any raises after this review. Id. at 137. He asserted that "[m]ost of [the review] is lies, but there's very small amounts of truth" in it. Id. at 140. He acknowledged, for example, that he may have completed some tasks late. Id. at 141, 150. Jackson does not know if other people also had negative reviews. Id. at 157. According to Vazquez, she continued correcting Jackson on various problems in November and December of 2006.

On January 19, 2007, Vazquez gave Jackson a memo that outlined her ongoing concerns regarding his performance. Memo from Christie Vazquez to Tony Jackson, January 19, 2007, Def. Ex. H. In that memo, Vazquez stated that Jackson failed to deliver three plans for improvement.  Jackson replied that the plans were late but that he eventually delivered them. Jackson Dep. at 195-6. Jackson contends that he had made some progress on some of the other identified issues, but that someone told him to stop

working on them. Id. at 193. He also requested training, but Olshevski told him that he wanted Jackson to improve before the company invested in that. Olshevski Dep. at 52.

Vazquez sent Jackson another memo on January 30, 2007, which outlined another meeting regarding his progress. She asked him to make a presentation on various parts of the company's computer system to demonstrate his knowledge of the "Planco Notes environment." Memo from Christie Vazquez to Tony Jackson, January 30, 2007, Def. Ex. I. On February 24, 2007, Jackson made this presentation, which he described as a "dog-and-pony show which I had to perform for them" and a "joke." Jackson Dep. at 195, 208. See also Memo from Christie Vazquez to Tony Jackson, February 24, 2007, Def. Ex. J. Vazquez described Jackson's presentation as "high level", but identified some items that she thought were errors or omissions from the presentation. Id. She wrote that she expected Jackson to be "able to give specific details of the environment" and make suggestions regarding "how to improve system availability." Id. at 2. She concluded that she was "not confident that Tony can perform adequately as the Lotus Notes Administrator." Id.

At some point, Jackson viewed Vazquez as a friend, and based "on [his] speculation" believes that Vazquez wrote negative

-12-

reviews for him because of Olshevski's influence. Jackson Dep. at
165. Jackson noticed that Vazquez treated him differently after
Olshevski's arrival but had no other evidence to show that
Olshevski had ordered Vazquez to "get rid" of him. Id.  Vazquez
thought that by early 2007 Jackson "was growing increasingly
irritated with his performance management," and she believed he
was angry about it. Vazquez Decl. at 2.

### E.   Jackson's Complaints Regarding Discrimination

On March 22, 2007, Jackson met with Mary Creedon and
stated that he "felt [he] was being discriminated against because
of [his] health." Jackson Dep. at 222. See also Creedon Decl. at
1. He told her that Olshevski always found fault with his work
despite his attempts to do things correctly. Jackson Dep. at 222.
Jackson says that he did not talk to Creedon specifically
regarding retaliation, but Creedon recalls that Jackson thought
Olshevski didn't like him and that he was being treated poorly
partially because he had been out on leave. Id. at 234; Creedon
Dep. at 14. Creedon contacted The Hartford's Employee Relations
Investigation Department, which assigned Gregg Goumas to
investigate Jackson's discrimination claims. Creedon Decl. at 1-
2; Goumas Dep. at 28.

Creedon told Jackson that she would stop Vazquez from "micromanaging" him during the discrimination investigation, and he said this change created a "100 percent better environment." Jackson Dep. at 236. See also Creedon Decl. at 2. Jackson did not believe that Vazquez's "micromanagement" was based on his disability or medical conditions. Jackson Dep. at 241. But he thought she behaved this way on the orders of Olshevski, and Jackson believed that Olshevski did base his decisions on Jackson's medical condition. Id. Jackson thought that Olshevski "wanted to get rid" of him and concluded that the change in the way management treated him after Olshevski's arrival must have been based on his disability "[b]ecause there was no other thing to base it on." Id. at 346.

In his deposition, Jackson admitted that he had no "specific evidence that the performance plan and the change in the way [he] felt that [he was] reviewed was based on [his] disability." Id. He stated that he had no evidence to support his belief that Olshevski wanted to "get rid" of him because of his disability. Id. at 347. He also said he had no evidence that Vazquez was discriminating against him when she concluded that he could not perform his job. Id. at 353. This, too, was based on Jackson's "belief." Id.

On April 3, 2007, Goumas had a phone conference with Jackson and Creedon.[10] Goumas Dep. at 37. During the investigation, Jackson told Goumas that his relationship with Olshevski was fine when Olshevski arrived in the summer of 2006, but that it went downhill after Jackson returned from the hospital in September of that year. Id. at 80. Goumas spoke with Olshevski and Vazquez, apparently in separate phone conversations, on April 24. Id. at 39, 51. By that time they were both aware of Jackson's discrimination complaint. Id. at 39. Goumas also spoke with Paladino two days later. Id. at 66. Goumas reviewed the November 2006 annual performance evaluation and other documents in Jackson's file after those conversations, but he did not review Jackson's earlier performance evaluations or his actual personnel file. Id. at 52-53.

Based on Goumas's conversations with Vazquez, Paladino, and Olshevski, he concluded that "after [Jackson] had returned to work his mental capacity had been severely diminished and that he was really no longer the same person that he was before." Id. at 85. Goumas emphasized that Paladino's comments had a "particular impact" because Jackson seemed to think highly of him. Id. Goumas

---

[10] Jackson does not remember this conversation but "wouldn't deny" that it occurred. Jackson Dep. at 235.

himself thought that Jackson was "funny" and "generally a nice guy." Id. at 112.

On April 30, 2007, Creedon participated in a conference call with Goumas, Jackson, and Davis, in which Goumas told Jackson that his investigation had revealed no basis for Jackson's belief that Olshevski had discriminated against him. Jackson Dep. at 236; Creedon Decl. at 2; Goumas Dep. at 108-09; Davis Dep. at 30. Apparently, Creedon, Jackson, and Davis were together in the same office and they spoke with Goumas over the telephone. Creedon Dep. at 19. Goumas concluded that Jackson's negative performance evaluations "were well supported" and that "Jackson was not capable of performing the essential functions of his position." Creedon Decl. at 2. See also Goumas Dep. at 108-09. Goumas stated that Jackson said very little during this conversation. Goumas Dep. at 109. Davis also reported that Jackson reacted with "little emotion" and "probably thanked [Goumas] for his work" because Jackson "was always very polite in that way." Davis Dep. at 31-32.

After Goumas gave his report, Creedon explained that given this outcome she would tell Olshevski and Vazquez that they could resume their performance management of Jackson. Creedon Dep. at 37-38. Creedon also offered Jackson a lower-paid position

-16-

at PLANCO that would primarily involve data entry, but Jackson immediately turned down that option notwithstanding Creedon's offer to give him some time to think it over.[11] Creedon Decl. at 2-3; Creedon Dep. at 19. At her deposition, Creedon said that she believed that Jackson was "disgusted by the offer" and reported that he "left [her] office steamy." Creedon Dep. at 19. But Creedon also confirmed that her notes from that meeting indicated that Jackson had said, "'Thank you, but no.'" Id. at 39.

### F.   PLANCO's Internet Policies

PLANCO asserts that it terminated Jackson because he violated the company's policies regarding Internet use and posed a safety threat to its employees. Under PLANCO's policies, employees are banned from using PLANCO's information systems and networks to access "Inappropriate Web/Email Content." Computer and Internet Policies, Ex. P-12 to Goumas Dep ("PLANCO Policies"). This includes "[v]isiting, downloading, or distributing inappropriate material and/or pornography," which "is grounds for immediate termination." Id. Although these policies banned employees' use of "inappropriate" Web sites,

---

[11] Creedon said she had Connor's permission to give Jackson this offer and told Connor that Jackson turned it down. Creedon Dep. at 20.

Jackson had no guidance from the company regarding what sites were permitted or banned. Jackson Dep. at 104. Jackson claims, in fact, that he never actually saw the policy and that it was not in the employee handbook, but he does not know whether it was on the company's intranet because he did not use the intranet often.[12] Id. at 281-82, 285. Even if Jackson did not see the policy, however, he knew that one existed but thought that it was not enforced because many people in his department viewed Web sites that the filter blocked. Id. at 271.

In addition to the policies described above, The Hartford had an Internet filter in place at PLANCO. The filter blocked specific Web sites and also blocked all Web sites that contained key words. Szoke Dep. at 56. Jackson described the Internet filter as something that "stops you from going to sites . . . that are considered inappropriate by Hartford." Jackson Dep. at 245. Nonetheless, according to Jackson, many people in his department visited blocked sites when the filter was down. Specifically, Jackson saw Vazquez visit the Web site for Facebook. Id. at 246. Vazquez admitted that she visited social

---

[12] In Jackson's complaint, moreover, he references this policy and states that it was in effect when he was suspended on May 2, 2007. Complaint at ¶ 32.

networking sites while the filter was down and said that others
in the department also viewed blocked sites when they could.
Vazquez Dep. at 58-59. It was Szoke's responsibility to notify
The Hartford when the filter was down, which he claimed had
happened about six times. Szoke Dep. at 75. Szoke said that "it
was amazing . . . how quickly people learned about the content
filter being down" and that it became a "free-for-all" of
employees visiting blocked Web sites, such as email or Fantasy
Football sites. Id.

### G.   Vazquez Sees Jackson Visiting Gun Web Sites at Work

On May 1, 2007, Jackson visited the Web site
playboy.com "[t]o see if the filter was down" because he wanted
to look at other Web sites that would not be available if the
Internet filter was functioning.[13] Jackson Dep. at 245. See
also id. at 292 (plaintiff acknowledging that he "knowingly went
to websites that were banned because [he] knew the filter was
down"). On that day and the next, he also visited mossberg.com
("a website for shotguns and rifles"), agrussell.com ("a knife

---

[13] At his deposition, Jackson said that he knew "for a
fact" that another person had gone to playboy.com on that day,
but Jackson admitted that he had brought up the Web site on his
coworker's computer "[t]o surprise him." Jackson Dep. at 248-49.

company" that sells knives), gunsamerica.com, and impactguns.com,
among other Web sites. Id. at 250-252. See also List of Web
sites, Def. Ex. N. He explained that he visited the gun Web sites
that day because his wife wanted to go skeet shooting and had a
Mossberg shotgun but "needed an adjustable stock." Jackson Dep.
at 250-51. Jackson saw an advertisement for the stock in an NRA
magazine and said that he wanted to know where he could purchase
one. Id. at 251.

        According to Jackson, PLANCO's Internet filter did not
block all gun sites, but he estimates that he visited five or six
blocked gun Web sites on the first two days of May 2007. Id. at
254. Jackson believed that he was perceived as a threat, as
discussed below, "because of the evil firearms" but said that he
was an NRA member and "would have to disagree" that the gun Web
sites that he visited were inappropriate. Id. at 270-71. Although
Jackson acknowledged that there is a difference between Facebook
and playboy.com, he contended that there was no difference
between going to yahoo.com and a gun Web site because "one is not
more evil than the other." Id. at 272-73.

        Vazquez had five "write-ups" to give to Jackson on May
2, 2007, but she happened to see him visiting the gun Web sites
-- specifically, sites with handguns on them -- and became

-20-

scared.[14] Vazquez Dep. at 25, 28. Vazquez had seen Jackson viewing gun Web sites on several occasions when the filter was down, and she saw Paladino observe Jackson doing the same thing. Id. at 26-28. Although Vazquez had seen Jackson looking at handgun sites before, she explained that this was shortly after the well-known shooting incident at Virginia Tech,[15] and she was worried that "Tony was becoming agitated by all of these write-ups that he was getting." Id. at 25. By then she had been "performance managing" Jackson for about six months. Id. at 26.

### H.   PLANCO's Investigation Regarding the Gun Web Sites

Vazquez met with Davis that afternoon to discuss Jackson's performance issues, but she did not mention her concern about the gun Web sites when she called to set up the meeting. Davis Dep. at 40. At the end of the meeting, however, Vazquez told Davis that she had seen Jackson viewing these gun sites and

---

[14] Vazquez did not give these write-ups to Jackson, and he did not know about them. Vazquez Dep. at 25. Davis said that she and Vazquez discussed a written warning for Jackson on that day, but that they were going to meet again before Vazquez gave it to Jackson. Davis Dep. at 59.

[15] On April 16, 2007, a gunman killed thirty-three people, including himself, and injured fifteen others on the campus of the Virginia Polytechnic Institute. John M. Broder, 32 Shot Dead in Virginia, Worst U.S. Gun Rampage, N.Y. Times, April 17, 2007, at A1.

said that she was "frightened about his possible reaction after getting the write-ups." Vazquez Dep. at 31. See also Davis Dep. at 45-46. This conversation occurred around 2:30 p.m. or 3:00 p.m. on May 2, 2007. Davis Dep. at 50. See also Ex. P-29 to Davis Dep., Jackson Ex. 3. Vazquez does not remember if she told Davis that she had previously seen Jackson view gun Web sites, but she did tell Davis that Jackson owned guns. Vazquez Dep. at 31. According to Davis, Vazquez said that she had concern for herself, but more so for Olshevski, because Jackson "seem[ed] to be blaming [Olshevski] for a lot of the performance management." Davis Dep. at 46. Jackson never did anything, however, to make Vazquez feel threatened. Vazquez Dep. at 36.

Davis told Vazquez that it was "the right thing" to let her know about Jackson's visits to gun Web sites and then asked Matt Szoke, the "security person at IT [information technology]," to give her a report of Jackson's Internet activity. Davis Dep. at 47. Szoke sent her the report that same afternoon, and Davis checked some of the Web sites. Id. at 47, 50. She remembered that some of the sites were for purchasing guns and that "there were a lot of pictures of guns." Id. at 50-51. She did not see any violent pictures or anything that particularly scared her. Id. at 51.

Davis then spoke in person with Kevin Connor and reported that "there was concern in IT that someone had been visiting gun websites." Connor Dep. at 15. She told him that Jackson was the employee at issue but did not tell him that Vazquez made the report. Id. at 15-16. Connor trusted Davis's assessment that the safety concerns were legitimate and did not ask who had complained about Jackson's Internet use. Id. at 18. Davis reminded Connor about Jackson's performance issues and his "heightened sensitivity," as well as his discrimination complaint. Id. at 19, 32. She told him "that management and IT didn't feel that Tony was in the appropriate position, that [PLANCO] offered him another position which he turned down, and that now the incident of him viewing a website caused concern in IT for safety."  Connor Dep. at 20. Connor did not know that other managers had permitted Jackson to visit gun Web sites and he had never personally fired someone for inappropriate Web usage. Connor Dep. at 38.  Connor asked Davis for a recommendation regarding the next steps. Id. at 20.

Goumas was again assigned to investigate Jackson's Web surfing and purported violations of the company's Internet policy. Goumas Dep. at 20-21, 120. After Davis reviewed the Web sites, she spoke with PLANCO's counsel and Goumas, and they

-23-

thought it would be best to put Jackson on leave while they investigated the issue. Davis Dep. at 49. Davis called Connor, who knew that Jackson was under performance management, to tell him what had happened and to recommend that PLANCO place Jackson on leave. Id. at 49, 52. Connor authorized the suspension. See id. at 54.

Around 8:30 p.m., Davis called Jackson and explained that because he had been on "a disturbing website," the company was conducting an investigation and that he should not return to work until further notice. Jackson Dep. at 256. See also Davis Dep. at 37. Jackson knew that Davis was referring to the gun Web sites he had visited earlier that day. Jackson Dep. at 257. But at the time of his deposition, Jackson still did not know who had complained about his Web site usage. Id. at 242. Davis also called a PLANCO employee to shut off Jackson's building and computer access and arranged for plain-clothed police to be at PLANCO the next morning. Davis Dep. at 58, 64-65. She also contacted Olshevski and Vazquez to let them know that they did not have to come to work the next day. Id. at 62-63.

Olshevski never saw Jackson display violent tendencies and described him as an outsider who was "friendly, but quirky

and unusual."[16] Olshevski Dep. at 88. But Olshevski felt threatened when he learned that Jackson had visited gun Web sites at work,[17] and he "was very concerned for [his] family." Id. at 91. At dinner that night, Olshevski showed his children a picture of Jackson and warned them to run away if they ever saw him. Id. The next day, Vazquez and Olshevski discussed their safety concerns regarding Jackson. Vazquez Dep. at 29-30, 35. Vazquez said that she "had a lot of anxiety, and there was still fear" and mentioned that Jackson knew where she lived. Id. at 29.

Davis spoke with PLANCO's counsel and Goumas on May 3, 2007, and they decided that Goumas should contact Jackson to ask him questions about his gun Web site visits. Davis Dep. at 66. Goumas, who already knew that Jackson owned many guns, spoke the next day to Jackson regarding these issues, and Davis may also have been a participant in that call. Goumas Dep. at 120, 136, 145. Goumas did not know who complained about Jackson visiting gun Web sites, and he did not feel that it was important to talk

---

[16] Olshevski reported that Jackson was an apparent Trekkie with "a very detailed knowledge of Star Trek." Olshevski Dep. at 89-90.

[17] Olshevski believes he heard about this via phone from Alan Hoyt. Olshevski Dep. at 92.

with that employee.[18] _Id._ at 130-31. Olshevski does not remember speaking to Goumas during this investigation, either. Olshevski Dep. at 98-9. Goumas does not recall whether he personally visited the Web sites at issue because "it was enough for [him] that they were gun websites." Goumas Dep. at 136.

Goumas concluded that Jackson viewed material that was inappropriate "because it's blocked by The Hartford's filter, and Mr. Jackson knew it to be blocked." _Id._ at 163. Goumas believed that any blocked sites would be "inappropriate," but he also said that employees should use their common sense to determine what was permitted. _Id._ at 164, 178. Goumas also understood that other employees had been terminated for knowing violations of the policy, but he could not give any details regarding those situations due to asserted attorney-client privilege. See _id._ at 169-70.

Goumas was not aware of any violent history of Jackson's, at work or elsewhere, and Goumas knew that Vazquez and other PLANCO employees had gone shooting with Jackson. _Id._ at 135, 137. Goumas did not speak to Jackson's co-workers to ask them if they were scared or felt threatened, but he nonetheless

_____

[18] Vazquez did not speak to Goumas or Connor regarding Jackson's visits to the gun Web sites. Vazquez Dep. at 34.

concluded "that folks at PLANCO were very, very, very concerned about the possibility that this could result in violence, and they were afraid," especially because this incident happened soon after the "Virginia Tech massacre." Id. at 124-25.

## I.   PLANCO's Decision to Fire Jackson

Following conversations with counsel, Goumas, and Peg Lesiak,[19] Davis decided to recommend to Connor that PLANCO terminate Jackson.[20] Davis Dep. at 68, 70. Davis did not speak to anyone else regarding this decision, and she and Connor were the only participants in that conversation. Id. at 82; Connor Dep. at 20. Davis based her recommendation on Jackson's Web site usage and the safety concerns of employees, especially Olshevski.[21]

---

[19] Lesiak was Creedon's boss, and Davis communicated with her about this situation while Creedon was out of the office. See Davis Dep. at 60.

[20] Goumas believes that PLANCO terminated Jackson because he "knowingly and willingly on more than one occasion, especially on this occasion [May 1-2, 2007], accessed sites that he knew to be blocked." Goumas Dep. at 124. But Goumas also appeared to think that Jackson's performance issues played a role in PLANCO's decision to fire him. See id. at 125.

[21] Olshevski did not make the decision to terminate Jackson, but he is "sure" that Davis would have consulted him about the decision. Olshevski Dep. at 98-99. He does not remember if anyone asked his opinion regarding what action the company should take. Olshevski Dep. at 99. Vazquez played no part in the
(continued...)

Davis Dep. at 79. She knew that Vazquez had gone shooting with Jackson, but she thought that the employees' safety concerns were legitimate. Id. at 81, 88. The then-recent events at Virginia Tech may have influenced her, as well. Id. at 79-80.

Davis told Connor that PLANCO could place a final warning in Jackson's file or terminate him. Connor Dep. at 26. After considering both options, Connor decided to terminate Jackson to protect employee safety. "In light of the timing of the situation and the heightened sensitivity around workplace violence, [he] just felt that that was the only decision [he] could come to." Id. Connor did not know about Jackson's gun collection when they suspended him on May 2, 2007, but he believes he learned about it before he decided to fire Jackson.[22] Id. at 34. Connor did not do his own investigation into the facts at issue but instead relied on information from Davis. Id. at 27, 33.

_____

[21] (...continued)
decision to fire Jackson. Vazquez Decl. at 2.

[22] During the investigation of Jackson visiting gun Web sites, Davis learned from the local police that Jackson owned more than twenty guns, including an Uzi. Declaration of Jamie Davis, Def. Ex. T.

-28-

On May 8, 2007, Goumas and Davis called Jackson to tell him that his employment was terminated because he violated the company's Internet policy. Jackson Dep. at 241, 274. Jackson protested that it was "ridiculous" for PLANCO to conclude that he was a threat, especially since so many of his co-workers knew about his interest in guns. Id. at 276. Jackson did not believe that the people with whom he worked -- especially those who had gone shooting with him -- had any reason to be afraid of him. Id. at 354. Notably, he presents no evidence to contest that in May of 2007 Vazquez and Olshevski were actually afraid of him. Id. at 355. Jackson also had no evidence to show that Connor had any reason to discount his employees' security concerns. Id. at 357. He nevertheless believes that PLANCO "tried to terminate [him] because of [his] health" but was unable to do so. Id. at 277. Jackson thinks that he should have received a warning before being terminated. Id. at 279. After PLANCO terminated Jackson's employment, it had police stationed at the company for three or four weeks. Davis Dep. at 88-89.

## II.  __Analysis__[23]

---

[23] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled

(continued...)

In his complaint, Jackson claimed that he was the
victim of discrimination in violation of the ADA and retaliation
for exercising his rights pursuant to the ADA and FMLA.[24] PLANCO

_____

[23] (...continued)
to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In
ruling on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  Liberty Lobby, 477 U.S. at 255.
       The moving party bears the initial burden of
proving that there is no genuine issue of material fact in
dispute.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,
475 U.S. 574, 585 n.10 (1986). Once the moving party carries this
burden, the nonmoving party must "come forward with 'specific
facts showing there is a genuine issue for trial.'"  Matsushita,
475 U.S.  at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving
party must present something more than mere allegations, general
denials, vague statements, or suspicions.  Trap Rock Indus., Inc.
v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins.
Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982).  It
is not enough to discredit the moving party's evidence, the non-
moving party is required to "present affirmative evidence in
order to defeat a properly supported motion for summary
judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original).
A proper motion for summary judgment will not be defeated by
merely colorable or insignificantly probative evidence.  See
Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party
has the burden of proof at trial, then that party must establish
the existence of each element on which it bears the burden.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

       [24] He also claimed relief for these actions pursuant to
the Pennsylvania Human Relations Act ("PHRA"). Because
Pennsylvania courts "generally interpret the PHRA in accord with
                                        (continued...)

has moved for summary judgment on all of Jackson's claims, and Jackson responded to that motion.[25]

     Jackson's discrimination and retaliation claims are governed by the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 759, n.3 (3d Cir. 2004); Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). Jackson must first establish a prima facie case of discrimination or retaliation.  The burden then shifts to PLANCO "to articulate some legitimate, nondiscriminatory reason" for its termination of Jackson. McDonnell Douglas, 411 U.S. at 802. Finally, the plaintiff has an opportunity to prove by a preponderance of the evidence that the employer's nondiscriminatory reason is pretextual. Id. at 804; Texas Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). At this

_____

[24] (...continued)
its federal counterparts," it is appropriate to treat Jackson's PHRA claims as "coextensive" with his federal claims. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

    [25] In PLANCO's brief, it discusses the sufficiency of the evidence regarding a hostile work environment and discrimination claims other than Jackson's termination from PLANCO. Def. Brief at 18-21. But plaintiff responded that he does not assert these claims, and we will therefore not discuss them here. Pl. Brief at 16, n.5.

third phase, Jackson's burden of showing pretext merges with his ultimate burden of proving that "the defendant intentionally discriminated against the plaintiff." Burdine, 450 U.S. at 253. See also id. at 256. Jackson may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 256. See also Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)

The McDonnell Douglas framework "serves to bring the litigants and the court expeditiously and fairly to [the] ultimate question" of whether PLANCO intentionally discriminated against Jackson. Burdine, 450 U.S. at 253. In other words, that framework helps courts determine whether unlawful reasons motivated an employer to take an action against an employee.

We will first address Jackson's discrimination claim and then turn to his claim of retaliation.

### A.   Discrimination

#### 1.   Prima Facie Case and Legitimate Nondiscriminatory Reason

To establish a prima facie case for discrimination under the ADA, Jackson must show that he "(1) has a disability (2) is a qualified individual and (3) has suffered an adverse

-32-

employment action because of that disability." <u>Deane v. Pocono Med. Center</u>, 142 F.3d 138, 142 (3d Cir. 1998). For the purposes of this motion, PLANCO assumes that Jackson has established a <u>prima facie</u> case, and we will therefore not discuss this part of the analysis. <u>See</u> Def. Brief at 15, n.14.

At the second stage of the <u>McDonnell Douglas</u> framework, the employer's burden is "relatively light"; PLANCO simply has to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes</u>, 32 F.3d at 763. In this case, PLANCO asserts that it terminated Jackson because of his violation of the company's Internet policy and its concerns about employee safety. If proven, these would be unquestionably legitimate, nondiscriminatory reasons for terminating Jackson. Plaintiff concedes this. <u>See</u> Pl. Brief at 16. We will thus proceed directly to the pretext analysis in the third stage of the <u>McDonnell Douglas</u> burden shifting framework.

## 2.   <u>Pretext</u>

To establish pretext, Jackson must present some evidence by which a reasonable factfinder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2)

believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Under the Fuentes test, the evidence plaintiff proffers must meet a heightened "level of specificity" to survive summary judgment. Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998). Jackson must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765 (internal quotations omitted).

Jackson can raise an inference of discrimination with evidence that non-members of the protected class were treated more favorably.  See Tucker v. Merck & Co., 131 Fed. Appx. 852, 855 (3d Cir. 2005); E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990). He has the burden of showing that "similarly situated persons were treated differently." Simpson, 142 F.3d at 645. To raise an inference of discrimination, he must show something more than "the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group." Id. at 646. In addition, "[t]he similarity between the compared employees must exist in all relevant aspects

-34-

of their respective employment circumstances." <u>Pierce v.</u>
<u>Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994).

Jackson argues that other employees, including Vazquez,
visited blocked sites and were not terminated.[26] He also claims
that the investigation leading to his termination was suspect
because Connor did not look to see whether other employees
visited blocked Web sites while the filter was down and if
management was aware of this. But there is no evidence that any
of these other employees were being performance managed or had
viewed Web sites about guns, weapons, or other violent topics.
Both of these facts are highly "relevant aspects" to Jackson's
"employment circumstance," and we therefore conclude that the
other employees to whom Jackson refers were not similarly
situated for the purpose of demonstrating pretext.

Jackson also contends that PLANCO did not sufficiently
investigate the allegations that he posed a safety threat. For
example, Goumas and Connor did not know that Vazquez reported
Jackson's behavior and did not speak with Vazquez or visit the

---

[26] In depositions, plaintiff's counsel asked many
questions about Steve Coleman, a PLANCO employee who occasionally
exhibited anger and had difficulties at his job. Coleman
eventually resigned from PLANCO. Jackson does not argue in his
brief that Coleman was similarly situated to him, and we will
therefore not address defendant's discussion of Coleman.

gun Web sites that were the subject of the investigation.
Instead, Goumas and Connor relied on Davis's reports of those
events. Jackson argues that any reasonable person would want to
know these facts and that Goumas and Connor "didn't want to find
them out" and "preferr[ed] to be isolated from them." Pl. Brief
at 19-20. He contends that this lack of knowledge is particularly
suspect because Vazquez -- who made the complaint about employee
safety -- was one of his supervisors and had been interviewed in
connection with Jackson's discrimination complaint. In his brief,
Jackson claims that Vazquez's position "would cause a reasonable
person to queston [sic] Ms. Vazquez's motivation," especially
given her knowledge about Jackson's gun ownership and use, as
well as her knowledge that Jackson had previously visited gun Web
sites at work. Id. at 20.

       This evidence is also not sufficient to support a
conclusion that PLANCO's reasons are pretextual. The inconvenient
fact is that Jackson himself did not complain about Vazquez
discriminating against him; he only lodged a complaint about
Olshevski and believed that Vazquez was simply Olshevski's
instrument in carrying out his purportedly discriminatory plan.
By his own account, Jackson did not target Vazquez in his
discrimination complaint, so she would have no reason to protect

herself. There is, furthermore, nothing suspicious about a high-level executive such as Connor relying on reports from his staff regarding Jackson's behavior rather than duplicating their fact-finding. Nothing in the record suggests that Davis lied in this case or that Connor would have any reason to think she did.

The record also shows that Connor made the decision to terminate Jackson, and there is no evidence that Connor had any reason to protect Vazquez or Olshevski, or to target Jackson. There is, moreover, nothing suspect about Vazquez at one time being comfortable with the idea of Jackson as a gun owner and gun Web site viewer but later being frightened by it in the context of Jackson's performance management in May of 2007. Perhaps most importantly, Jackson has no evidence to counter the claims of Olshevski and Vazquez that they were <u>actually</u> afraid of him in May of 2007.[27]  The accounts of their fears, such as Vazquez's

---

[27]  Jackson also contends that the Virginia Tech incident should have influenced the decision "no more than the religious faith and malicious action of one person of a certain religion should call into question the law abiding character of another person with that same faith." Pl. Brief at 20, n.6. We see nothing wrong with PLANCO's managers being influenced by this event, especially as it simply and understandably made them more concerned about protecting employees' safety. We note that -- unlike religion -- the status of "gun owner" is not a protected class for purposes of employment discrimination. There is, furthermore, no evidence that PLANCO fired Jackson simply because
(continued...)

report to Davis and Olshevski's warning to his children, are consistent throughout the record.

Jackson cites Kowalski v. L&F Products, 82 F.3d 1283 (3d Cir. 1996), for the idea that a "material fact question as to employer's good faith in relying upon results of an investigation preclude[s] summary judgment." Pl. Brief at 21. The defendant in Kowalski fired plaintiff Teresa Kowalski on the basis of a private investigator's report that Kowalski was cleaning professional offices during a medical leave of absence. Kowalski, 82 F.3d at 1286. The decisionmaker in that case "relied heavily" on the investigator's summary of the statements of two witnesses who told the investigator only that Kowalski had contracted to do cleaning services, not that she actually did them. Id. Kowalski herself told the decisionmaker that she owned a cleaning service but did not do any cleaning herself during that period. Id. The decisionmaker nonetheless refused to allow Kowalski to present evidence to support her side of the story and fired her based solely on the erroneous report of the private investigator. Our Court of Appeals concluded that the decisionmaker "should have

---

[27] (...continued)
he was a gun owner or that Connor -- the lone decisionmaker here -- had any problems with gun ownership itself.

cast a wary eye toward [the report's] factual conclusions"
because the investigator never saw Kowalski cleaning and
inaccurately reported that other witnesses saw her do so. Id. at
1290. The Court of Appeals noted, inter alia, that the defendant
never introduced the investigator's report into evidence and that
the decisionmaker's reasons for seeking the report changed during
the course of the court proceedings. Id. The Court concluded that
"where the contents of the primary piece of evidence upon which
the defendant relies is contradicted by witness testimony and is
not even introduced, summary judgment is inappropriate." Id.

Jackson's case differs from Kowalski in important ways.
First, Jackson does not dispute the key facts upon which Connor
says he made his decision: that Jackson was being performance
managed, Olshevski and Vazquez were scared of him, Jackson was a
gun owner (and therefore had easy access to firearms), and
Jackson visited gun Web sites at work that were usually blocked.
Connor also had no reason to disbelieve -- and certainly there is
no evidence that contradicted -- the information he received from
Goumas and Davis before he made his decision. There is also no
indication -- and plaintiff does not argue -- that the record
before us is missing any critical documents.  Moreover, PLANCO's
reasons for investigating and terminating Jackson are consistent.

For these reasons, we believe that _Kowalski_ does not preclude summary judgment here.

Jackson was also unable in his deposition to produce _any_ evidence beyond his own "belief" and speculation that PLANCO discriminated against him. He had no "basis or evidence for believing that Mr. Olshevski wanted to get rid of [him because of his] disability" but simply _believed_ this was the case. Jackson Dep. at 347. Although Olshevski believes he was "consulted" about the decision to terminate Jackson, the evidence in the record shows that Connor was the decisionmaker, and Jackson has produced no evidence that Connor was discriminatory toward him or had any reason to protect Olshevski.

In the face of Vazquez's and Olshevski's uncontested actual fear of Jackson, Jackson's naked _intuition_ that Olshevski's alleged discriminatory animus toward him somehow infected PLANCO's decision to terminate his employment will not support a conclusion that the firm's reason for terminating him was pretextual. Because Jackson has not produced specific facts to show pretext, we will grant PLANCO's motion for summary judgment as to Jackson's discrimination claim.

B.    **Retaliation**

1.    **Prima Facie Case and
      Legitimate Nondiscriminatory Reason**

To establish a prima facie case for his retaliation

claims, Jackson must "show that [he] engaged in protected

activity, [PLANCO] took adverse action either at the same time or

after the activity, and a causal relationship existed between

[his] protected activity and [PLANCO's] adverse action." Kaufmann

v. GMAC Mortg., 229 Fed. Appx. 164, 169 (3d Cir. 2007). In its

brief, PLANCO does not challenge the first two parts of this

test. See Def. Brief at 22, 24. PLANCO argues only that Jackson

has no evidence to support his contention that there was a causal

relationship between his termination and his complaint about

Olshevski's alleged discrimination and purported dissatisfaction

with Jackson's one week of sick leave.

Jackson contends that he has established the requisite

causal link because the temporal proximity between his

termination, and his complaint about, and PLANCO's resolution of,

the purported discrimination is "unusually suggestive." See Jalil

v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (holding that a

Title VII retaliation plaintiff established a causal link between

his protected activity and his discharge when the employer fired

the plaintiff two days after the employer received his discrimination charge from the Equal Employment Opportunity Commission); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) ("[I]f Jalil is to be interpreted as holding that timing alone can be sufficient, that holding must be confined to the unusually suggestive facts of Jalil.").

PLANCO argues that the relevant period for determining whether the timing was "unusually suggestive" would be that between Jackson's complaint to Creedon on March 22, 2007[28] and the company's decision to terminate him on May 8, 2007. The employer argues that this period does not support a finding of "unusually suggestive" temporal proximity. But Jackson contends that the applicable time frame is between the conclusion of PLANCO's investigation of his discrimination claim on April 30, 2007, and his suspension a few days later. Plaintiff also notes that Goumas questioned Vazquez -- the person who lodged the complaint about safety concerns -- regarding Jackson's discrimination complaint on April 24, 2007.

---

[28] In Jackson's conversation with Creedon, he mentioned that he thought Olshevski was discriminating against him both because of his purported disabilities and because he took medical leave.

-42-

As we have discussed elsewhere, the jurisprudence of our Court of Appeals is not clear regarding whether the temporal proximity in this case would be sufficient to support a causal connection at the <u>prima facie</u> stage. <u>See</u> <u>Helm v. Matrix Svc. Indus. Contractors</u>, No. 07-cv-4622, 2008 WL 4889013, *17-*18 (E.D. Pa. Nov. 12, 2008). But for the purposes of this opinion, we will assume that it suffices to establish Jackson's <u>prima facie</u> case.

Again, Jackson does not contest that PLANCO has offered a legitimate, nondiscriminatory reason for its termination of his employment. We will therefore move to the pretext phase of the analysis.

### 2.   <u>Pretext</u>

In Jackson's brief he contends that, in addition to the close timing between his complaint to Creedon and his termination, it is suspicious that only Vazquez and Olshevski believed that he was a safety threat because they "would be motivated to retaliate" against him. Pl. Brief at 23. He also argues that PLANCO did not proceed in good faith in relying on their reported concerns.

As we discussed above, we do not see why Vazquez would be "motivated to retaliate" against Jackson when she was not a target of Jackson's discrimination complaint. There is nothing in the record to suggest that Connor should not have relied on the information he received from Goumas and Davis, and no reasonable factfinder could conclude that Connor acted suspiciously in dismissing Jackson based on that information. Jackson argues that his managers' safety concerns were "suddenly awakened" by his discrimination complaint, which is analogous to his claims about the purportedly suspicious timing of his dismissal. Pl. Brief at 24. Having disposed of these meritless arguments, we turn to the timing issue.

Although timing alone may be sufficient to establish causation at the plaintiff's pretext stage, Jackson cites no case -- and we are aware of none -- to suggest that timing alone could suffice to show pretext. Our Court of Appeals stated in Jalil that at the pretext stage -- as opposed to the prima facie stage -- suspect timing simply "may suggest discriminatory motives" on the part of the employer. 873 F.2d at 709 (emphasis added). The panel concluded that the employer's proffered reason was pretextual because, in addition to the suspicious timing, the employer also failed to have a written rule, or a clear unwritten

-44-

rule, against the plaintiff's behavior that allegedly led to his termination.

Here, unlike <u>Jalil</u>, PLANCO had a written computer policy that Jackson admitted in his Complaint applied to him at the time of his termination. Jackson acknowledged that the gun Web sites were "inappropriate" and were prohibited by the company's Internet policies. Jackson also knew that the sites he visited were usually blocked, and he intentionally visited them while PLANCO's filter was down. Plaintiff has not shown that any other employee who was under performance management and visited Web sites about weapons or violence was not dismissed. And, again, there is no evidence that Connor -- the lone decisionmaker here -- was discriminating against Jackson or was influenced by Olshevski's purported discrimination.

With no direct evidence of discrimination, our inquiry at this stage is whether the employer's proffered explanation is "unworthy of credence." The timing issue, combined with Jackson's (at best) thin and unsupported claims about Connor's reasons for terminating him, would not allow a reasonable factfinder to conclude that PLANCO is <u>lying</u> about its consistent, legitimate, and nondiscriminatory reason for terminating Jackson: to protect its employees from mortal harm.

-45-

On this record, then, we conclude that, despite the (hypothesized) temporal proximity between his complaint and termination, Jackson has not met his burden of showing that a discriminatory reason more likely motivated PLANCO.  He has also not identified genuine issues of fact upon which a reasonable factfinder could find that PLANCO's legitimate, nondiscriminatory reasons for terminating him should be distrusted. We will therefore grant PLANCO's motion for summary judgment on Jackson's retaliation claims.

III.  **Conclusion**

Jackson has not produced evidence of specific facts that could support a reasonable factfinder's conclusion that PLANCO's legitimate, nondiscriminatory reasons for terminating his employment were pretextual. We will thus grant PLANCO's motion for summary judgment and enter Judgment in favor of PLANCO.